# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| MACHELLE PEARSON, MARIA SHELDON, and RACHELL GARWOOD, on behalf of themselves and others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MICHIGAN DEPARTMENT OF CORRECTIONS, HEIDI WASHINGTON, in her individual and official capacity, JEREMY HOWARD, in his individual and official capacity, SHAWN BREWER, in his individual and official capacity, RUSSELL MARLAN, in his individual and official capacity, KENNETH MCKEE, in his individual and official capacity, LLOYD RAPELJE, in his individual and official capacity, LIA GULICK, in her individual and official capacity, MARTI KAY SHERRY, in her individual and official capacity, DAVID JOHNSON, in his individual and official capacity, KARRI OUSTERHOUT, in her individual and official capacity, WAYNE STATE UNIVERSITY, CARMEN MCINTYRE, in her individual and official capacity, JAMES BLESSMAN, in his individual and official capacity, CORIZON HEALTH, INC., a Delaware Corporation, and JEFFREY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 2:19-cv-10707 VAR-PTM

District Judge Victoria A. Roberts
Mag. Judge Patricia T. Morris

| | |
|---|---|
| BOMBER, in his individual and official capacity, )<br>Defendants. ) | |

| | |
|---|---|
| )<br>REBECCA SMITH, on behalf of )<br>herself and others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHIGAN DEPARTMENT OF )<br>CORRECTIONS, HEIDI )<br>WASHINGTON, in her individual )<br>capacity, SHAWN BREWER, in his )<br>individual capacity, and CORIZON )<br>HEALTH, INC., a Delaware )<br>Corporation, )<br>)<br>Defendants. )<br>) | Case No. 2:19-cv-10771 VAR-EAS<br><br>District Judge Victoria A. Roberts<br>Mag. Judge Elizabeth A. Strafford |

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48226
P: (313) 777-7LAW
jon@jmarkolaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0387013)
Nicole Schladt (MN0400234)
80 South Eighth Street, Suite 4600
Minneapolis, MN 55402
P: (612) 256-3200
morgan@nka.com

**PITT MCGEHEE PALMER &**

**MI DEP'T OF ATTORNEY GEN.**
Scott A. Mertens (P60069)
Neil Giovanatti (P82305)
Tracey Van den Bergh (P70066)
Kristie A. Sparks (P79177)
John L. Thurber (P44989)
MDOC Division
P.O. Box 30217
Lansing, MI 48909
P: (517) 335-3055
mertensS@michigan.gov

***Attorneys for Defendants MDOC,***
***Washington, Brewer, Marlan,***
***McKee, Rapelje, Gulick, Johnson,***
***Ousterhout, and Sherry***

**RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes
(P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold St., Ste. 2320
Detroit, MI 48226
(313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

***Attorneys for Plaintiffs Pearson,
Sheldon, and  Garwood***

**LAW OFFICE OF DANIEL
RANDAZZO**
Daniel Randazzo (P39935)
2731 South Adams Rd., Ste. 100
Rochester Hills, MI 48309
(248) 853-1003
Attyrandaz@aol.com

***Attorneys for Plaintiff Smith***

**CHAPMAN LAW GROUP**
Ronald W. Chapman, Sr. (P37603)
Wedad Ibrahim (P81970)
1441 West Long Lake Rd, Suite 310
Troy, MI  48098
P: (248) 644-6326
rchapman@chapmanlawgroup.com

***Attorneys for Defendants Corizon
and Bomber***

**TANOURY NAUTS MCKINNEY
& GARBARINO**
Cullen B. McKinney (P49757)
Trevor J. Zamborsky (P77244)
38777 Six Mile Road, Ste 101
Livonia, MI  48152
P: (313) 964-4500
Cullen.mckinney@TNMGLaw.com

***Attorneys for Defendants Wayne
State, McIntyre, and Blessman***

## CONSOLIDATED MASTER CLASS ACTION COMPLAINT

Plaintiffs, by their undersigned counsel, hereby file their Consolidated Master Class Action Complaint against the above-named Defendants amending the complaints of, and consolidating, case numbers 2:19-cv-10707 VAR-PTM and 2:19-cv-10771-VAR-EAS. On behalf of themselves and all others similarly situated, Plaintiffs hereby state as follows:

### INTRODUCTION

1. Huron Valley Correctional Facility for Women ("WHV") is operating under a state of degradation, filth, and inhumanity, endangering the health and safety of the incarcerated women and staff alike on a daily basis.

2. WHV is underfunded, understaffed, poorly trained, poorly administered, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the prison walls.

3. Incarcerated women are regularly denied access to adequate medical and mental health care, hygienic conditions, and movement.

4. As a result, the women incarcerated in WHV were exposed to *Sarcoptes scabiei* ("scabies"), caused by the spread of parasitic mites.

5. The scabies has taken a huge toll on these women, both physically and mentally because it caused horrendous, unbearable itching pain, which in turn

impacted the inflicted's mental health and led to scarring and additional infections.

6.     The women complained for years, but their pleas went largely ignored. Defendants failed to provide adequate access to medical care, a properly trained medical staff, screening programs, appropriate medications, and resources to properly examine, test, and treat the women's obvious symptoms of infestation.

7.     Even when Defendants did attempt to treat the women for scabies, they did so in a haphazard way and without following the proper protocols for quarantine and disinfection, ensuring that the infestation would remain to spread among the population.

8.     In fact, one brave dermatologist had to fight his way into the prison before the hundreds of women locked in WHV finally had access to the critical, life-saving treatment they so desperately needed.

9.     As discussed below, conditions at WHV have deteriorated to such a degree as to expose Plaintiffs and the proposed Classes to an unreasonable risk of serious harm to their health and safety, in violation of the rights guaranteed to them under the United States Constitution.

10.     The constitutional violations complained of herein are not isolated incidents impacting few inmates and caused by a few doctors or correctional personnel.  Rather, the scabies outbreak at WHV, and the related lack of medical care, has persisted for more than three years and impacted prisoners housed in at

least eight distinct units.

11.     Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at WHV yet have failed to timely or effectively remedy the deplorable state of affairs.

12.     This is a civil rights class action, brought under 42 U.S.C. § 1983, challenging the inhumane, dangerous, and unconstitutional conditions endured by the women locked inside WHV.

13.     Plaintiffs, on behalf of themselves and members of the proposed Classes, seek monetary damages, and injunctive and declaratory relief.

## JURISDICTION AND VENUE

14.     Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, and jurisdiction is therefore proper pursuant to 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper in this District under 28 U.S.C. § 1391. The parties reside, or at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district. Defendants are subject to this Court's personal jurisdiction.

## PARTIES

16.     Plaintiff Machelle Pearson ("Pearson") is a woman residing in Dearborn Heights, Michigan. Pearson was formerly incarcerated at WHV and was paroled in August 2018. Pearson brings this Complaint on behalf of herself and the

proposed Classes, as described herein.

17.     Plaintiff Maria Sheldon ("Sheldon") is a woman residing in Grand Rapids, Michigan.  Sheldon was housed at WHV until approximately February 21, 2019 when she was transferred.   Sheldon was released from incarceration on approximately April 29, 2019.  Sheldon brings this Complaint on behalf of herself and the proposed Classes, as described herein.

18.     Plaintiff Rachell Garwood ("Garwood") is a woman currently incarcerated in WHV since approximately August 2018.  Garwood brings this Complaint on behalf of herself and the proposed Classes, as described herein.

19.     Plaintiff Rebecca Smith ("Smith") is a woman currently incarcerated in WHV since approximately February of 2010. Smith brings this Complaint on behalf of herself and the proposed Classes, as described herein.

20.     Defendant Michigan Department of Corrections ("MDOC") is a Michigan governmental agency that operates WHV.  WHV is a prison for women located in Washtenaw County, Michigan. It is the only prison in Michigan that houses women.

21.     Defendant Heidi Washington ("Washington"), at all relevant times, has been the Director of the Michigan Department of Corrections.   As Director, Washington oversees Michigan's correctional system, including WHV.  Her duties and responsibilities include a responsibility for developing and implementing

policies and procedures for the operation and management of the Michigan Department of Corrections and its employees, including prisoner healthcare. She is responsible for the care, custody and protection of prisoners under the jurisdiction of the Michigan Department of Corrections. Washington is named as a Defendant in both her official and unofficial capacity.

22.     Defendant Jeremy Howard ("Howard"), at relevant times, has been the acting Warden of WHV. As acting Warden, Howard is responsible for overseeing the operation of WHV, development of WHV policies and practices, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, including healthcare staff, and ensuring that Defendants enforce and abide by policies and regulations at the MDOC, the State of Michigan, and the United States. He is further responsible for the care, custody and protection of individuals including Plaintiffs. Howard is named as a Defendant in both his official and unofficial capacity.

23.     Defendant Shawn Brewer ("Brewer"), at relevant times, has been the Warden of WHV, and is now the acting Assistant Deputy Director for the Operations Division of the Correctional Facilities Administration ("CFA") at MDOC. As Warden, Brewer was responsible for overseeing the operation of WHV, development of WHV policies and practices, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, including

healthcare staff, and ensuring that Defendants enforced and abided by policies and regulations at the MDOC, the State of Michigan, and the United States. He was further responsible for the care, custody and protection of individuals including Plaintiffs. As acting Assistant Deputy Director for the CFA's Operations Division, Brewer is responsible for the operation of all correctional institutions in the MDOC system, including promulgating and administering MDOC's policies related to the placement and custody of individual prisoners at MDOC facilities. Brewer is named as a Defendant in both his official and unofficial capacity.

24. Defendant Russell Marlan ("Marlan"), at all relevant times, has been the Deputy Director for Field Operations Administration at MDOC.  As Deputy Director, Marlan's duties and responsibilities include field operations within the MDOC system, including promulgating and administering MDOC's policies. Marlan is named as a Defendant in both his official and unofficial capacity.

25. Defendant Kenneth McKee ("McKee"), at relevant times, has been the Deputy Director for CFA at MDOC.  As Deputy Director, McKee's duties and responsibilities include the operation of all correctional institutions in the MDOC system, including promulgating and administering MDOC's policies related to the placement and custody of individual prisoners at MDOC facilities.  McKee is named as a Defendant in both his official and unofficial capacity.

26. Defendant Lloyd Rapelje ("Rapelje"), at relevant times, has been the

Assistant Deputy Director for CFA at MDOC.  As Assistant Deputy Director, Rapelje's duties and responsibilities include the operation of the Jackson Region of CFA, including the WHV, and promulgating and administering MDOC's policies and supervising and administering the Warden for WHV.  Rapelje is named as a Defendant in both his official and unofficial capacity.

27.     Defendant Lia Gulick ("Gulick"), at relevant times, has been the Acting Deputy Director for Budget and Operations Administration at MDOC.  As Acting Deputy Director, Gulick is responsible for budgetary matters related to, among other matters, prisoner healthcare.  Gulick is named as a Defendant in both her official and unofficial capacity.

28.     Defendant David Johnson ("Johnson"), at relevant times, has been the Deputy Warden of WHV.  As Deputy Warden, upon information and belief, Johnson is responsible for the operation of WHV, development of WHV policies and practices, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, including healthcare staff, and ensuring that Defendants enforced and abided by policies and regulations at the MDOC, the State of Michigan, and the United States.  He is further responsible for the care, custody and protection of individuals including Plaintiffs.  Johnson is named as a Defendant in both his official and unofficial capacity.

29.     Defendant Karri Ousterhout ("Ousterhout"), at relevant times, has been

10

the Deputy Warden of WHV.  As Deputy Warden, upon information and belief,
Ousterhout is responsible for the operation of WHV, development of WHV policies
and practices, and the supervision, training, discipline, and other functions of
WHV's employees, staff and/or agents, including healthcare staff, and ensuring that
Defendants enforced and abided by policies and regulations at the MDOC, the State
of Michigan, and the United States.  She is further responsible for the care, custody
and protection of individuals including Plaintiffs.  Ousterhout is named as a
Defendant in both her official and unoffical capacity.

30.     Defendant Marti Kay Sherry ("Sherry"), at relevant times, has been the
Acting Administrator for the Bureau of Health Care Services for the MDOC.  Sherry
is responsible for coordinating and monitoring healthcare services for prisoners.
This includes, but is not limited to, creating training objectives, vetting training
materials, and coordinating contractor training of both MDOC and Corizon
employees relating to integrated health care.  Sherry is named as a Defendant in both
her official and unoffical capacity.

31.     Defendant Wayne State University School of Medicine ("Wayne
State") is a medical school with a campus located in the Eastern District of Michigan.
In or around January of 2018, Wayne State contracted with MDOC to oversee
healthcare for inmates in Michigan state prisons, including working with medical
staff employed by Corizon to provide medical care in state prisons.  Under the

contract, Wayne State provides a Chief Medical Officer, an Assistant Chief Medical Officer, and a Chief Psychiatrist to MDOC.

32. Defendant Carmen McIntyre ("McIntyre") has been since approximately January 2018 the Chief Medical Officer for the MDOC through a contract between the MDOC and Wayne State.  McIntyre is employed by Defendant Wayne State.  As Chief Medical Officer, McIntyre works closely with Defendant Corizon's medical staff to, in part, implement policies, analyze health care data, identify areas of improvement, and consult.  McIntyre is named as a Defendant in both her official and unofficial capacity.

33. Defendant James Blessman ("Blessman") has been since approximately January 2018 the Assistant Chief Medical Officer for the MDOC through a contract between the MDOC and Wayne State.  Blessman is employed by Defendant Wayne State.  As Assistant Chief Medical Officer, Blessman works closely with Defendant Corizon's medical staff to, in part, implement policies, analyze health care data, identify areas of improvement, and consult.  Blessman is named as a Defendant in both his official and unofficial capacity.

34. Defendant Corizon Health, Inc. ("Corizon") is a corporation incorporated in Delaware that does a substantial amount of its systematic and continuous business in Michigan as "Corizon of Michigan", and has been registered to do business in Michigan since 2000.  At all relevant times, Corizon has held a

multi-million-dollar prison health contract with the State of Michigan to provide healthcare services for Michigan prisons, including at WHV.

35.     Defendant Jeffrey Bomber, D.O., C.C.H.P. ("Bomber") has been at all relevant times acting Regional Medical Director at Corizon.  As medical director, Bomber is responsible for overseeing Corizon's healthcare professionals working in WHV.  Bomber is named as a Defendant in both his official and unofficial capacity.

<u>**FACTUAL ALLEGATIONS**</u>

36.     Plaintiffs and the proposed Classes, by reference incorporate the preceding paragraphs as though fully set forth herein.

37.     Plaintiffs are and were inmates of WHV and bring this action on behalf of similarly situated former, current, and future inmates of WHV.

38.     WHV houses convicted women. The facility houses substantially more than 2,000 women at any given time.

39.     WHV is currently the only women's prison in the state of Michigan.

40.     At all material times, the actions and/or omissions alleged herein occurred under color of state law, and the individual employees of the Defendants were acting within the scope and course of their employment.

41.     At material times, Defendant MDOC employed Defendants Washington, Howard, Brewer, Marlan, McKee, Rapelje, Gulick, Sherry, Johnson, and Ousterhout, all of whom initiated and carried out the policies, practices, and

customs of MDOC, and are also liable for their own actions and/or omissions.

42.   At material times, Defendant MDOC contracted with Defendant Wayne State, which—through the direction and oversight of Defendants McIntyre and Blessman—provided medical training and oversight to WHV.  Wayne State is also liable for its own actions and/or omissions.

43.   At material times, Defendant MDOC contracted with Defendant Corizon, which—through the direction and oversight of Defendant Bomber—provided medical services at WHV.  Corizon is also liable for its own actions and/or omissions.

### MDOC's Relationship with Corizon

44.   Healthcare services at Michigan's prisons are provided by a combination of government healthcare professionals—including medical directors, nurses, and clinical monitoring teams—and third-party contractors.

45.   Defendant Corizon, previously Prison Health Services, Inc. and Correctional Medical Services, Inc., has provided Michigan prisons with healthcare services, including resident physicians, since 1998.  The scope of Corizon's services expanded in 2016 to include mental health and pharmacy.  Stateside Staff, "Despite Increased State Supervision, Expert Says Private Prison Health Care Comes at a Cost," NPR (May 25, 2018).

46.   MDOC pays Corizon a fixed monthly fee regardless of the number of

patients treated or the amount of services rendered.  This arrangement provides Corizon with "an incentive to skimp in certain areas" so to increase profits.  Sarah Lehr, "Ingham Commissioners Blast Plan to Use Company With 'Abysmal' Record for Jail Medical Care," Lansing State Journal (Feb. 27, 2019) (quoting District 11 Commissioner Emily Stivers of Meridian Township).

47.    Corizon will receive $715.7 million dollars under its contract with the MDOC from 2016 until 2022.  Id.

48.    In its capacity as the primary healthcare provider for MDOC, Corizon has engaged in a pattern and a practice of failing to provide adequate medical care to Michigan's inmates and detainees, including those housed at WHV, in violation of their Eighth Amendment rights against Cruel and Unusual Punishment.

49.    Corizon's track record working for MDOC has been "abysmal," including a "deeply troubling history of litigation and human rights abuses."  Id. (quoting District 2 Commissions Ryan Seboldt of Lansing).

50.     Corizon has been sued for medical malpractice 660 times over a five-year period.  Id.

51.    Corizon racked up more than $1.6 million in penalties from MDOC between 2016 and 2018 for failing to meet the level of services specified in its contract with the state.  Corizon has also been put on course corrective plans, most of which relate to timeliness of care.  Id.

52.    Despite this "abysmal" track record, the MDOC does not adequately oversee Corizon.  A past state audit revealed that the MDOC only completed 50% of required audits of Corizon's performance.  Stateside Staff, supra.

**Conditions at WHV**

53.    At all material times the prison and its bunkrooms have been overcrowded, and the conditions at WHV are filthy and dangerous, providing a breeding ground for communicable diseases and pests.

54.    As an example, at all material times black mold was found in the Gladwin Unit.  The mold in the Gladwin Unit was so notoriously bad that it had eaten away an entire corner of the tile ceiling in the shower area.

55.    Further, because the shower area in the Gladwin Unit lacks proper ventilation, condensation drips on the women and their clothes while they shower and would not properly dry.

56.    Defendants do not provide a medical screening for scabies prior to placing inmates in the general population at the facility.

57.    Additionally, while Defendants MDOC, Washington, Howard, Brewer, Marlan, McKee, Rapelje, Gulick, Sherry, Johnson, and Ousterhout, used to allow the incarcerated women to clean with bleach, they changed that practice and began providing significantly diluted cleaning agents that do not adequately clean the aggressive filth.

58.    Defendants MDOC, Washington, Howard, Brewer, Marlan, McKee, Rapelje, Gulick, Sherry, Johnson, and Ousterhout were aware of the conditions and did nothing to remedy the dangerous condition.

59.    Defendants systemically failed to provide livable conditions at WHV and to provide basic medical care and treatment to inmates, resulting in persistent and reoccurring outbreak of scabies, which spread throughout WHV's multiple units and which Defendants continuously failed to eradicate.

**Scabies**

60.    Scabies is an infestation. Tiny mites, known as *Sarcoptes scabiei*, live in the outer layers of human skin. As the mites burrow and lay eggs, the infestation leads to relentless itching and rashes. (See https://www.webmd.com/skin-problems-and-treatments/ss/slideshow-scabies-overview).

61.    The rash results can appear as small red bumps, welts or scaly lesions that can transform into scales, blisters, bleeding, and open sores caused by scratching. (See https://www.verywellhealth.com/scabies-overview-1069441.) The scabies rash typically occurs on the wrists, in between fingers, in armpits, around the waist, between thighs, and in the genital area. (Id.)

62.    Scabies is contagious and typically spreads through skin-to-skin contact, but that is not the only means of transmission. (See https://www.aad.org/public/diseases/contagious-skin-diseases/scabies#overview.)

Shared personal items such as bedding, clothes, furniture or towels may also cause the spread. (Id.)

63.     It is well-known that prison inmates can be at a higher risk for acquiring scabies. (See https://www.webmd.com/skin-problems-and-treatments/ss/slideshow-scabies-overview.)

64.     Scabies infestations lead to relentless and unbearable itching, especially at night.

65.     Due to the severity of the itching at night, those infested with scabies can    demonstrate    an    inability    to    sleep.    (see https://www.aad.org/public/diseases/contagious-skin-diseases/scabies#symptoms.)

66.     The inability to sleep and perpetual discomfort, particularly over long periods of time, can result in mental illness and/or severe emotional distress.

67.     The itching and scratching associated with scabies also may lead to painful open sores, secondary bacterial infections, and/or secondary infestations of microorganisms, including *Staphylococcus aureus* and *Streptococcus pyogenes*. (See https://www.michigan.gov/documents/scabies_manual_130866_7.pdf.)

68.     Scabies can result in permanent, visible scarring.

69.     Doctors should be able to identify scabies based on the appearance of the rash and the description of the itch. Other standard tests can also be used to diagnose    such    condition.    (See    https://www.webmd.com/skin-problems-and-

18

treatments/ss/slideshow-scabies-overview.)

70.     Verification of a scabies infestation should be attempted prior to treatment.  (See https://www.michigan.gov/ documents/scabies_manual_130866 _7.pdf.)

71.     When treating scabies, the environment must also be thoroughly cleaned to prevent re-infestation.  (Id.)  This includes changing and laundering all patient linens and washable personal items in water that is at least 120 degrees Fahrenheit before and after treatment and sealing non-washable items in a plastic bag for seven days.  (Id.)  Furniture should be disinfected and covered in plastic for seven days.  (Id.) Patient rotation among units should be ceased.  (Id.) Symptomatic patients should be monitored weekly.  (Id.)  If symptom severity does not lessen after two weeks, the scabies diagnosis and/or treatment should be reconsidered.  (Id.)

**The Rash**

72.     In or around November 2016, detainees and inmates at WHV began complaining to Defendants—including multiple guards, nurses, nurse practitioners, and doctors—about horrible itching and rashes they were developing.

73.     The rashes appeared to begin in the Gladwin unit and spread to at least eight of WHV's fifteen units by March of 2018.  Paul Egan, "Prison Will Close to Visitors While All 2,000 Women treated for Scabies," Detroit Free Press (Jan. 14, 2019).

74.    The rashes women developed caused red bumps to appear on the inner thighs, buttocks, arms, backs, and chests of those afflicted, and caused unbearable pain from itching.

75.    Women complained about the symptoms, but their requests for treatment largely were ignored by guards, nurses, physician assistants, and physicians.

76.    Defendants engaged in a pattern and practice of refusing to provide women with medical care, dismissing women's complaints without providing proper evaluation of symptoms, failing to properly test for and treat scabies, failing to properly disinfect cells and personal items, and failing to properly quarantine and contain impacted women.

77.    The rash and itching were so unbearably painful that many of the women will suffer scarring because of the rash itself, as well as scratching to relieve the horrendous itching.

78.    For example, Plaintiff Pearson's rash was so bad that she has scars around her ankles and feet.  Another inmate developed large bruises on her thighs from all the itching.

79.    Further some women will develop additional bacterial infections from improper treatment of the wounds caused by the scratching.

80.    According to published newspaper articles, despite repeated complaints

to Defendants about the rashes, in February 2018, Defendants "ruled out" scabies as the main source of the rash outbreak.  See Paul Egan, "How Flint MD solved rash mystery that stumped women's prison officials," Detroit Free Press (Jan. 18, 2019).

81.     In February and March of 2018, dermatologists evaluated and tested some affected patients, but their testing and medication recommendations were ineffective. (Id.)

82.     Defendant McIntyre subsequently postulated that the samples were likely to be gathered by inaccurate scraping methods.  Egan, supra (Jan. 14, 2019).

83.     Indeed, the Michigan Department of Community Health cautions that "[n]egative findings do not rule out the presence of scabies." (https://www.michigan.gov/documents/scabies_manual_130866_7.pdf.)

84.     Defendants administered prescription steroid cream, claiming that it had been effective for some of the afflicted women.

85.     Defendants did not provide creams to all women exhibiting symptoms. As a result, untreated women had to beg those lucky enough to receive the creams to share.

86.     When the steroid cream did not work, Defendants advised the women to try mixing the steroid cream and other ointments together to try to remedy the rash.

87.     Unsurprisingly, this haphazard mixture did not provide any relief to the

afflicted women who's suffering only worsened as the year continued.

88.     The itching and discomfort was so bad that women resorted to pouring bleach mixtures on their body in the shower.

89.     It was not until the end of 2018—nearly ten months after its first testing—when Defendants again seriously considered the possibility of scabies. Around that time, some women were allegedly treated for scabies, and clothing and bed linens were allegedly replaced. See Paul Egan, "At least 24 Cases of Scabies Found at Michigan's Only Women's Prison," Detroit Free Press (Jan. 4, 2019).

90.     In fact, it wasn't until Dr. Walter Barkey, a dermatologist from Flint, visited WHV in late December 2018 to meet with inmates, that a diagnosis of scabies was made.

91.     Dr. Barkey, who had read reports about the rash outbreak and received information firsthand from a friend whose daughter is an inmate at WHV, reached out to Defendants to offer to examine and treat the afflicted prisoners. See Egan, supra (Jan. 18, 2019).

92.     Dr. Barkey had several telephone interviews with Defendants to see inmates at the facility before he was allowed access. (Id.)

93.     Dr. Barkey brought a microscope with him to the facility and was able to detect samples of the live mites from skin scrapings of some women and determine their rashes were scabies. (Id.)

94.    Dr. Barkey is quoted as saying "To my knowledge there were never any plans to 'bring in' a dermatologist." (Id.)

95.    By December 2018, on information and belief, nearly two-hundred women, almost 10% of the total prison population, suffered from an unbearable rash and red bumps that had been plaguing women since November 2016.

96.    Instead of helping the incarcerated women, in November or December of 2018, Defendants blamed the inmates as the cause of their own suffering—saying that the rash was a result of the women improperly using prison-issued cleaning fluids and using "homemade" laundry detergent to hand-wash their clothing, rather than sending them to the prison laundry.

97.    While Defendants tried testing for parasites in early 2018, they had failed to properly diagnose the incarcerated women and effectively eradicate the infestation because, on information and belief, Defendants failed to train its health officials on or properly execute Michigan's Department of Community Health, Scabies and Prevention and Control Manual or other applicable scabies protocols.

98.    Defendants had approximately two years before Dr. Barkey's arrival to bring in a competent dermatologist to examine the skin rash that the incarcerated women were suffering from, or successfully test, appropriately treat, and/or properly eradicate the skin rash that plagued the prison.

99.    It was not until early January 2019 when Defendants acknowledged

they were aware of the scabies diagnosis and could treat it. <u>See</u> Egan, <u>supra</u> (Jan. 4, 2019).

100.   According to published reporting, Defendants only attempted to treat all 2070 women inmates for scabies after Dr. Markey's visit. <u>See</u> Egan, <u>supra</u> (Jan. 18, 2019).

101.   Defendants only began to quarantine infested individuals from the general population or disinfect their surroundings in 2019.

102.   Even these efforts, however, have been inadequate, often requiring some inmates to be quarantined multiple times and submit to up to seven or eight doses of the prescribed medication, likely due in part to re-infestation caused by poor disinfecting and quarantining.

103.   For example, in November 2019—seven months after the initiation of this case—women housed in Unit Filmore were placed on lockdown and were medicated with two more doses of Ivermectin due to another scabies outbreak.

**<u>Deliberate Indifference</u>**

104.   Even after acknowledging that a pervasive health issue existed, Defendants utterly failed to provide adequate treatment and disregarded the risks associated with the above-described health issues.

105.   Defendants' failures amount to deliberate indifference towards Plaintiffs' Constitutional rights as well as deliberate indifference to the human

feelings and physical safety of Plaintiffs and the proposed Classes they seek to represent.

106.   The pain was so severe for some women that their mental health began to deteriorate, and they contemplated suicide to escape the daily onslaught of persistent, painful itching.

107.   On information and belief, Defendants failed to train medical staff to address the inmates' obvious needs to access adequate medical care and medication, to adequately screen/test for scabies, and to recognize outbreaks of contagious conditions such as scabies.

108.   On information and belief, Defendants ignored pleas for help and failed to implement and execute applicable scabies protocols, including the Michigan Department of Community Health's Scabies Prevention and Control Manual, to treat, quarantine, and properly disinfect inmates.

109.   Poor cleaning conditions and overcrowding at WHV further aggravated the infestation.

110.   Defendants' failure to properly and timely treat and eradicate scabies has had disastrous effects as the infestation continued over more than two years to spread and re-infest various units at WHV.

111.   Despite continuous complaints—including many kites and many filed grievances—over approximately two years, Defendants maintained a policy,

custom, pattern, and practice of utterly failing to remedy their gross failures and ignoring, denying, and then deflecting responsibility for the conditions at WHV causing deprivation of Plaintiffs' constitutional rights.

112.   The grievances women filed brought the infestation directly to the attention of Defendants Brewer and Washington on many occasions during Steps Two and Three, respectively, of the inmates' grievance process. Additionally, inmate members of the Warden's Forum Committee complained about the infestation to Defendants Brewer, Johnson, and Ousterhout at several Committee meetings. Meeting minutes were sent to other staff, including Defendant Rapelje.

113.   Many women never received treatment for their symptoms at all despite submitting multiple kites complaining about rashes and itching.

114.   On one occasion, a guard contacted healthcare for an inmate, but the doctors refused to see her.

115.   Fed up with the delays and refusals, another woman changed tactics and complained about having a yeast infection in an attempt to receive medical attention for her rash.

116.   Those who were lucky enough to eventually speak to medical professionals often had to wait several months and submit multiple kites. This delay was critical to the spread of the infestation as they lived in tight quarters with bunkmates.

117.    One inmate submitted nearly two kites a day during the fall of 2018 in an attempt to obtain medical care.  It took approximately a month to see a doctor.

118.    While awaiting care, many women were transferred to other units, other jails, or released, spreading the infestation further.

119.    Many of those inmates lucky enough to be seen by a medical professional, did not have their complaints taken seriously.  One woman was told that she was making herself itch.  Another was told she simply had dry skin.

120.    Another inmate had blisters on her wrists and between her fingers. Medical personal denied seeing a rash and told her not to kite again until she had one.

121.    Many inmates suffered for years without receiving proper diagnoses.

122.    Still others yet were hardly evaluated and many more were not tested for scabies or given medication even when doctors suspected a scabies diagnosis. Others yet received the wrong medication, exasperating symptoms in some cases.

123.    The lack of proper treatment was not simply the result of poor training and improper containment, but it also reflects an affirmative decision by administrators and officers to deliberately ignore the serious scope of the problem.

124.    Despite the multiple kites issued by inmates and detainees, Dr. Penrose told one inmate that she (the doctor) was not allowed to discuss the rashes with inmates.

125.   Dr. Qin indicated to another inmate that he was quitting because he was not able to properly treat inmates the way they should be treated.

126.   On information and belief, the conditions described above persist, thereby necessitating this Court's intervention to enjoin Defendants from continuing to violate Plaintiffs' and the Class Member's constitutional rights and to hold Defendants accountable to current and formerly incarcerated women who were forced to suffer unbearable pain and horrendous, inhumane, and deplorable conditions within the walls of WHV.

**Plaintiff Pearson**

127.   Plaintiff Pearson was an inmate in WHV's Gladwin Unit from approximately the end of December 2016 until June 2017.

128.   Shortly after her arrival, Plaintiff Pearson began experiencing significant itching related to rashes in her feet and thighs.

129.   The rashes were visible and a source of major emotional distress and physical injury.

130.   The rashes had the hallmarks of scabies: pimple-like rashes, scales and blisters and sores.

131.   Plaintiff Pearson developed scarring on her thighs, feet, and back.

132.   Plaintiff Pearson believes she reported problems associated with her rashes to the health care unit of WHV on more than ten occasions.

133. Plaintiff Pearson was provided unhelpful creams and a pill intended to treat worm infestations to try to treat the rash. She was also quarantined for three days. But beyond this ineffective treatment, Plaintiff Pearson's complaints were otherwise ignored by Defendants and she received nothing to help with the itching.

134. Despite repeated complaints, Plaintiff Pearson was not seen by a dermatologist.

135. Plaintiff Pearson has suffered physical injuries and emotional distress related to the untreated rashes.

136. Pearson did not get proper help for her condition until her release. Pearson lost two toe nails as a result of the healing process.

**Plaintiff Sheldon**

137. Plaintiff Sheldon became an inmate released in general population at WHV in the Filmore Unit in approximately the beginning of July 2018.

138. Around the time she arrived, guards circulated diagrams of women's bodies and asked them to circle where on their body they were itching or experiencing other systems.

139. Plaintiff Sheldon began itching and experiencing discomfort almost immediately, particularly at night.

140. The rashes had the hallmarks of scabies: pimple-like rashes, scales and blisters and sores.

141.   She found them on her buttocks, thighs, armpits, and behind her knees.

142.   The rashes were visible and a source of major emotional distress and physical injury.

143.   Plaintiff Sheldon reported problems associated with her rashes to the healthcare unit of WHV on several occasions.

144.   Plaintiff Sheldon issued her first notice to Defendants of her rash problems in or around August 2018, providing a detailed outline of the issue.  She received no medical attention in response.  She was told she was suffering from mosquito bites.

145.   Plaintiff Sheldon begged nurses to see her, and after much persuading, she was permitted to see a doctor in approximately September or October of 2018. The doctor indicated to Sheldon that her symptoms presented as scabies and that he was going to prescribed treatment accordingly.

146.   He further subjected Plaintiff Sheldon to skin scrapings and biopsies, and subsequently informed her that she was negative for scabies.  Plaintiff Sheldon later found out that WHV was scraping incorrectly, leading to the negative results.

147.   Plaintiff Sheldon never received the medication prescribed by the doctor.

148.   When Plaintiff Sheldon told Deputy Howard she had scabies, Howard disagreed and insisted that the issue was women's use of homemade detergents and

inadequate toilet cleaning.  Plaintiff Sheldon informed Deputy Howard that she did not use homemade detergents.

149.   Plaintiff Sheldon continued to complain, and her suffering continued to be ignored.

150.   Plaintiff Sheldon herself consulted medical resources about her condition.  From her own research, she determined she likely had scabies.

151.   It was only after she was seen by an outside dermatologist on or about December 27, 2018, that she was officially diagnosed with scabies.

152.   After this, Plaintiff received multiple doses of medication, but she was never properly quarantined, and her environment was not effectively disinfected, making eradication difficult.

153.   For example, after quarantine in December of 2018, they re-placed her in open barracks in the Lenawee Unit without disinfecting her bedding or living area.

154.   During another quarantine, they took her clothes but let her keep on her dirty bra and underwear.   After quarantine, Defendant gave her back her dirty, unwashed clothes to wear.

155.   Plaintiff Sheldon was transferred days before receiving her final dosage.  She worried that she would place inmates at other facilities at risk.

156.   Plaintiff Sheldon has suffered physical injuries and emotional distress related to the untreated rashes.  She has permanent dark spots on her body as a result.

31

**Plaintiff Garwood**

157.   Plaintiff Garwood became an inmate released in general population at WHV in Unit 9 in approximately August 2018.   Plaintiff Garwood is presently incarcerated at WHV.

158.   In approximately September 2018, Plaintiff Garwood was moved to Filmore A, where she was housed with a bunkmate who had been suffering from a rash long before Plaintiff Garwood's arrival. Plaintiff Garwood's bunkmate had complained about her rash to Defendants.

159.   In December of 2018, Plaintiff Garwood began experiencing a rash that resembled little bites on her buttocks, thighs, between her fingers, behind her knees, and under her armpits.

160.   At the time, Garwood's bunkmate was still suffering from a rash and was diagnosed with scabies on January 4, 2019.

161.   Despite Garwood's bunkmate's scabies diagnosis, Defendants did not quarantine either Garwood or her bunkmate, disinfect their bedding, clothes or living area, or test Garwood for scabies.

162.   Garwood promptly and continuously sought medical treatment for her rash, submitting at least six kite requests relating to her rash between January 4, 2019 and March 7, 2019.  Despite this, healthcare canceled her only medical appointment scheduled for January 14, 2019, and never rescheduled.

163.   In or around January of 2019, Garwood was treated with Ivermectin, along with the rest of WHV's prison population, without first being seen by a medical treater.

164.   Between doses, Garwood continued to kite for medical treatment in February and March of 2019, hoping to finally be seen by a medical treatment.  Her rash subsided after the second dose of Ivermectin.

165.   Garwood suffered from a scabies rash, which caused relentless itchiness and developed abscesses, and caused consequent trouble sleeping and emotional distress, for more than three months without being seen by medical personnel or tested for scabies.

166.   Plaintiff Garwood has suffered physical injuries and emotional distress related to the untreated rashes.

**Plaintiff Smith**

167.   Plaintiff Smith became an inmate released in general population at WHV in Gladwin B in approximately February of 2010.  Plaintiff Smith is presently incarcerated at WHV

168.   In January of 2017, while housed in Gladwin B, Smith began suffering from a visible and painful rash.

169.   Smith promptly kited for medical treatment related to her rash, verbally complained to WHV staff, and submitted grievances, all of which went unanswered

33

by Defendants.

170.    Despite Smith's requests and complaints, she was not seen by medical personnel until February of 2017.

171.    Despite Smith's visible rash and obvious distress, Defendants denied that Smith suffered from any illness or malady and further refused to allow her to obtain outside medical treatment.

172.    On or about October 14, 2017, Smith noticed a rash of red bumps, that resembled insect bites, developing on her right arm, which were accompanied by intense itching and a biting sensation.

173.    On or about January 9, 2018, Smith's rash worsened and spread.

174.    Smith reported her rash to a nurse at WHV who dismissed her complaint and merely advised that Smith change her soap.

175.    By February 23, 2018, Smith's body was covered with the rash and she, consequently, kited for medical treatment.

176.    Defendants ignored Smith's requests for medical treatment.

177.    Smith consequently grieved Defendants' failure to provide her with access to medical treatment.

178.    Smith's grievance, and those authored by individuals similarly situated to Smith, were routinely ignored and discredited by Defendants.

179.    By April 6, 2018, the itchiness of Smith's rash had become unbearable

and she was consequently unable to sleep.

180.   Again, Smith kited for medical treatment and, again, it was ignored by Defendants.

181.   On or about June 18, 2018, Smith remained unable to sleep as a result of the itchiness of her rash.

182.   Smith, again, kited for medical treatment, which was not provided.

183.   Smith was physically, mentally, and emotionally tormented by the sensation of insects biting her and the inability to obtain any relief from Defendants.

184.   Smith's emotional distress manifested itself in physical illness.

185.   Smith has suffered physical injury and emotional distress related to the untreated rashes. She has permanent scars on her body as a result.

## CLASS ACTION ALLEGATIONS

186.   Plaintiffs and the proposed Classes, by reference, incorporate the preceding paragraphs as though fully set forth herein.

187.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure 23.

188.   Plaintiffs assert their claims against all Defendants on behalf of the current and former inmate class defined as follows:

### Current and Former Inmate Class

All current and former detainees and inmates in WHV who, while incarcerated at WHV, had a skin rash consistent with a scabies

infestation and who were denied treatment, or whose delayed treatment caused the condition to worsen, since November 2016.

189.   Plaintiffs assert their claims against Defendants in their official capacities on behalf of the injunctive relief class defined as follows:

<u>**Injunctive Relief Class**</u>

All detainees and inmates of WHV who are incarcerated WHV.

(collectively referred to as "the proposed Classes").

190.   The proposed Classes exclude Defendants' officers, directors, and employees, as well as any judicial officer who presides over this action and members of the judicial officer's immediate family.

191.   **Fed. R. Civ. P. 23(a)(1)—Numerosity / Impracticality of Joinder**: The proposed Classes are so numerous that joinder of all proposed Class Members is impracticable. On information and belief, there are hundreds of Class Members in each proposed Class, all of whom are or were subject to the conditions set forth herein and therefore face a significant risk of serious illness and injury.

192.   Class members are identifiable using records maintained in the ordinary course of business by WHV.

193.   **Fed. R. Civ. P. 23(a)(2)—Commonality**: Common questions of law and fact exist as to all proposed Class Members. Among the common questions are, including but not limited to:

a)   Whether the unhygienic and dangerous conditions at WHV, and Defendants' refusal to provide adequate medical and mental

36

health care, subjected proposed Classes to an ongoing, substantial, and imminent risk of physical and psychological harm, illness, and death;

b)      Whether the conditions at WHV violate the Eighth Amendment's prohibition of cruel and unusual punishment;

c)      Whether Defendants' refusal to provide adequate medical and mental health care to Proposed Classes constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment;

d)      Whether the unhygienic and dangerous conditions at WHV, and Defendants' refusal to provide adequate medical and mental health care, result in constitutionally cognizable harm or present a constitutionally unacceptable risk of harm;

e)      Whether Defendants unreasonably instituted or condoned the dangerous and unhygienic conditions at WHV and refused to provide adequate medical and mental health care;

f)      Whether Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of Proposed Classes;

g)      Whether Defendants maintain a policy, custom, and/or widespread practice of violating Proposed Classes' constitutional rights through exposure to the dangerous conditions at WHV, the lack of adequate medical or mental health care, and the failure to train medical staff to address the proposed Classes' obvious needs to access adequate medical care;

h)      The nature, scope, and operation of Defendants' practices, policies and customs as applied to prisoners incarcerated at WHV; and

i)      Whether Defendants failure to hire, train, and/or supervise competent WHV staff and agents resulted in violations of Proposed Classes' constitutional rights.

194.   **Fed. R. Civ. P. 23(a)(3)—Typicality**: The claims of the Plaintiffs are

typical of other members of the proposed Classes, as their claims arise from the same

policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

195. Further, Defendants are expected to raise common defenses to these claims, so that final relief is appropriate for both Classes.

196. **Fed. R. Civ. P. 23(a)(4)—Adequacy of Representation**: Plaintiffs will fairly and adequately represent the interests of the proposed Classes and will serve diligently as class representatives. Their interests are aligned with those of the purported Classes and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

197. This action is maintainable as a class action because Defendants have acted or refused to act on grounds that generally apply to the proposed Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed Classes as a whole.

198. **Fed. R. Civ. P. 23(b)**—The Current and Former Inmate Class should be certified under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The illegal conduct is standardized; the Proposed Classes do not have an interest in individually controlling the prosecution of the case.

199.   Proceeding as a class action would permit the large number of injured parties to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and judicial resources. A class action is the only practical way to avoid the potentially inconsistent results that numerous individual trials are likely to generate. Numerous repetitive individual actions would also place an enormous burden on the courts, as they would be forced to take duplicative evidence and repeatedly decide the same issues concerning Defendants' conduct.

200.   The proposed Classes should also be certified under Federal Rule of Civil Procedure 23(b)(1) and/or (b)(2) because:

a)     The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for Defendants;

b)     The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c)     Defendant has acted or refused to act on grounds generally applicable to the proposed Classes, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

201.   Alternatively, this case can be maintained as a class action with respect to particular issues under Federal Rule of Civil Procedure 23(c)(4).

## CAUSES OF ACTION

## COUNT I: VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
### *(Against All Defendants)*

202.   Plaintiffs and the proposed Classes, by reference, incorporate the preceding paragraphs as though fully set forth herein.

203.   Dozens of complaints and requests for medical attention were filed by Plaintiffs and members of the proposed Classes and submitted to prison officials, all of which were inadequately addressed and many of which were ignored. The officials knew there was a substantial risk of serious harm to the proposed Classes but failed to act appropriately.

204.   Despite the numerous pleas for medical assistance regarding severe skin issues and injuries, Defendants did not provide basic medical care or assistance to assist Plaintiffs or the Proposed Classes.

205.   Despite the numerous pleas for medical assistance regarding severe skin issues and injuries, Defendants failed to appropriately train WHV personnel to identify, test for, treat, and/or eradicate outbreaks of contagious conditions, including scabies. The incidents of infestation were prevalent, involving hundreds of inmates. The Defendants' refusal to acknowledge the scabies, when confronted with hundreds of medical requests and grievances, is evidence of a failure to train.

206.   Even when Defendants did attempt to treat Plaintiffs or the Proposed

Classes for scabies, it did not follow appropriate protocol for the testing, treatment, and quarantine of Plaintiffs and the Proposed Classes and the disinfecting of the facilities.

207. Prison officials, including the Director and Warden, the prison guards, nursing staff, and doctors, all had actual and/or constructive knowledge of a widespread scabies infestation spreading through WHV. These individuals had knowledge of Plaintiffs' and Proposed Classes' asserted serious needs or were aware of the circumstances clearly indicating the existence of such needs, or subjectively perceived a risk of harm, but disregarded them by failing to take reasonable measures to abate them.

208. The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the proposed Classes they represent under the Eighth Amendment to the United States Constitution and laws in violation of 42 U.S.C. §1983, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this Complaint.

209. Such actions and decisions on the part of Defendants, individually, separately, and/or jointly, were done in a knowing, willful, or in a reckless manner and in bad faith.

210. By virtue of the special relationship of the state-imposed custodial setting, Defendants were under an affirmative obligation to spend their resources to

protect Plaintiffs and Proposed Classes from harm.

211.   Defendants had exclusive control over the movement and placement of inmates in their custody. Defendants knowingly and intentionally transferred infested inmates into the crowded cells of healthy inmates, placing them in close proximity to a dangerous contagion. Plaintiffs and the Proposed Classes had no ability to transfer away from infested inmates.

212.   Defendants' policies, practices, and customs violate Plaintiffs' basic human rights and dignity, and their right to be free from unconstitutional unhygienic and dangerous conditions and cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

213.   These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official and individual capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the proposed Classes.

214.   Defendants have been and are aware of the unconstitutional and dangerous conditions of WHV and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the proposed Classes.

215.   Defendants have failed to prevent, caused, and continue to cause

Plaintiffs and the proposed Classes tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury they are currently experiencing or are at risk of experiencing. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the proposed Classes as set forth above.

216.   Defendants' failure and refusal to treat the scabies infestation allowed it to spread to new hosts and caused the infestation to intensify and spread. Defendants' failure and refusal to train WHV personnel to respond appropriately to the scabies infestation exacerbated the problem. Defendants therefore were the primary cause of the dangers to which Plaintiffs were exposed and increased the vulnerability of Plaintiffs to these dangers.

217.   As a result of the Defendants' actions and/or omissions, Plaintiffs and the proposed Classes were deprived of their fundamental rights guaranteed by the U.S. Constitution, including the right to be free from cruel and unusual punishment and to adequate medical care for their serious medical needs while in the custody of the state.

218.   As a result of Defendants' unlawful conduct, Plaintiffs and the Proposed Classes are entitled to all damages and relief available at law and equity.

## <u>COUNT II: GROSS NEGLIGENCE</u>
### (*Against the "MDOC Defendants"*)

219.   Plaintiffs and the proposed Classes, by reference, incorporate the

43

preceding paragraphs as though fully set forth herein.

220.   Defendants MDOC, Washington, Howard, Brewer, Marlan, McKee, Rapelje, Gulick, Sherry, Johnson, and Ousterhout (the "MDOC Defendants"), as the custodial caretakers of Plaintiffs and the proposed Classes during their incarceration at WHV, owed them a duty of care.

221.   The MDOC Defendants not only breached their duty to Plaintiffs and the proposed Classes, but also acted with gross negligence under the laws of the State of Michigan as to Plaintiffs' safety, protection, and health by:

     a)   Failing to provide a reasonably clean, hygienic, and healthy environment that does not foster a breeding ground for communicable diseases, such as scabies, and that further violates MDOC policy directives;

     b)   Failing to promptly and effectively clean and disinfect Plaintiffs' living environment, including clothes, towels, sheets, and blankets, upon receiving notice of a scabies diagnosis, despite the known risk, and likelihood, that such failure would cause scabies to spread amongst the WHV population;

     c)   Failing to properly and timely quarantine infected individuals and knowingly placing inmates with visible rashes in cells with other inmates despite the known risk, and likelihood, that the rash would spread to those bunkmates;

     d)   Failing to promptly provide Plaintiffs and the proposed Classes with access to appropriate medical treatment upon notice of a rash and/or scabies-related symptoms, despite the known risk, and likelihood, that such failure would exacerbate Plaintiffs' symptoms and cause scabies to spread amongst the WHV population;

     e)   Acting or failing to act in other ways to expose Plaintiffs to a known and extreme risk to their health and safety that may or will become known during discovery.

222.   The acts and conduct of the MDOC Defendants alleged in the above stated cause of action, when considered under the laws of the State of Michigan, constitute gross negligence and the MDOC Defendants are not entitled to the immunity of MCL 600.1407(2) because they were grossly negligent.

223.   The conduct of the MDOC Defendants was so reckless as to demonstrate a substantial lack of concern for whether injury resulted and exhibited a deliberate indifference by intentional acts and/or omissions amounting to gross negligence.

224.   It was foreseeable that the MDOC Defendants' actions and omissions, as set forth above, would result in injury to Plaintiffs.

225.   The MDOC Defendants were the factual cause of Plaintiffs' injuries.

226.   The MDOC Defendants' actions were the ones most immediate, efficient, and direct cause of Plaintiffs' injuries.

227.   As the direct and proximate result of The MDOC Defendants' gross negligence, Plaintiffs and the proposed Class are entitled to all damages and relief available at law and equity.

### COUNT III: VIOLATION OF THE FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER
*(Against the MDOC Defendants)*

228.   Plaintiffs and the proposed Classes, by reference, incorporate the preceding paragraphs as though fully set forth herein.

229.   The Due Process clause of the Constitution provides that the state may not deprive a person of life, liberty, or property without due process of law.

230.   The MDOC Defendants, all acting in their official capacities, under color of law, and pursuant to customs, policies and/or practices, deliberately exposed Plaintiffs and the proposed Classes to scabies, failed to effectively and promptly treat Plaintiffs and the proposed Classes, despite direct and constructive knowledge of their scabies-related symptoms, ultimately exacerbating and prolonging the scabies outbreak and leading to reinfestations at WHV.

231.   The MDOC Defendants knowingly maintain an unsafe, unhealthy, and generally filthy facility at WHV, which fostered an environment for scabies to spread rampantly throughout the facility.

232.   The MDOC Defendants have exclusive control over the movement and placement of inmates in its custody and knowingly and intentionally transferred scabies-infected inmates into the crowded cells of healthy inmates, placing them in close proximity to a dangerous contagion.

233.   The MDOC Defendants failed to clean and disinfect the environment in which Plaintiffs and the proposed Classes inhabited allowing scabies to further spread in the facility.

234.   The MDOC Defendants failed to effectively respond and provide medical treatment to Plaintiffs and the proposed Classes, despite direct and

46

constructive knowledge of their scabies-related symptoms, allowing scabies to further spread in the facility.

235.   The MDOC Defendants affirmatively denied the existence of scabies in the facility,

236.   The MDOC Defendants exacerbated the scabies outbreak at WHV by failing to take reasonable and effective steps to mitigate the public health disaster that they created.

237.   The MDOC Defendants' conduct was so egregious and outrageous that it shocks the conscience.

238.   The dangers and risks of harm were discreet and special to Plaintiffs and the proposed Classes, as women incarcerated at WHV, and not risks affecting the public at large.

239.   As a direct and proximate result of the unconstitutional acts of the MDOC Defendants as alleged, Plaintiffs and the proposed Classes have experienced physical injury and emotional distress. As a result of the MDOC Defendants' unlawful conduct, Plaintiffs and the proposed Classes are entitled to all damages and relief available at law and equity.

## **RELIEF REQUESTED**

240.   WHEREFORE, Plaintiffs pray on behalf of themselves and the members of the proposed Classes for entry of judgment finding and awarding as

follows:

A)      Certifying the proposed Classes under Rule 23;

B)      For an Order adjudging the practices and conduct of Defendants complained of herein to be in violation of the rights guaranteed to Plaintiffs under the U.S. Constitution and federal and state law;

C)      For an Order adjudging that Defendants were deliberately indifferent to the serious medical needs of the Plaintiffs and Proposed Classes;

D)      For an Order adjudging that the MDOC Defendants' conduct was grossly negligent;

E)      For an Order adjudging that the MDOC Defendants failed to protect Plaintiffs and the proposed Classes from a state-created danger;

F)      For an Order adjudging that Defendants were deliberately indifferent to Plaintiffs and the proposed Classes by failing to train medical staff to address Plaintiffs' and the proposed Classes' obvious need to access adequate medical care and medication;

G)      For an award to Plaintiffs against Defendants, jointly and severally, all relief available under 42 U.S.C. § 1983 and state law, to

be determined at trial, with interest on such amounts;

H)     For an award to the Proposed Classes against Defendants, jointly and severally, all relief available under 42 U.S.C. § 1983 and state law, to be determined at trial, with interest on such amounts;

I)     For an award of injunctive relief to the Proposed Classes against Defendants;

J)     For an award to Plaintiffs and the Proposed Classes of actual damages, including those arising from loss of past and future income and benefits, humiliation, mental anguish, loss of reputation, emotional distress and other harm, in an amount in excess of $75,000 against Defendants Washington, Howard, Brewer, Marlan, McKee, Rapelje, Gulick, Sherry, Johnson, Ousterhout, McIntyre, Blessman, and Bomber in their individual capacities, Wayne State, and Corizon;

K)     For an award of punitive damages in an amount to be determined at trial;

L)     For an award to Plaintiffs of their attorneys' fees, disbursements, and costs in this action, pursuant to 42 U.S.C. § 1988, and as otherwise available at law or in equity;

M)     For an award of prejudgment interest;

N)     For such other and further relief as the Court deems just

and equitable.

Dated: February 20, 2020             Respectfully submitted,

/s/Rebekah L. Bailey
**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
Rebekah L. Bailey (MN 0389599)
Nicole J. Schladt (MN0400234)
80 South Eighth Street, Ste. 4600
Minneapolis, MN 55402
P: (612) 256-3200
F: (612) 338-4878
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48226
P: (313) 777-7LAW
jon@jmarkolaw.com

**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
F: (248) 268-7996
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**

David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
F: (313) 962-0766
detroitdefender@yahoo.com
samanthabaker@thedetroitdefender.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
F: (866) 571-1020
sradner@excololaw.com

**ON BEHALF OF PLAINTIFFS PEARSON,
SHELDON, AND GARWOOD**


Dated: February 20, 2020          /s/Daniel Randazzo
**LAW OFFICE OF DANIEL RANDAZZO**
Daniel Randazzo (P39935)
2731 South Adams Rd., Ste. 100
Rochester Hills, MI 48309
P: (248) 853-1003
F: (248) 853-1004
Attyrandaz@aol.com

**ON BEHALF OF THE PLAINTIFF SMITH**

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2020 I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system which will send notification

of such filing to the following:

Scott A. Mertens at: mertensS@michigan.gov, marshm3@michigan.gov,
toddw1@michigan.gov

Neil Giovanatti at: GiovanattiN@michigan.gov, MarshM3@michigan.gov,
parrishs@michigan.gov, ToddW1@michigan.gov

Tracey Van den Bergh at: Vandenberght@michigan.gov,
lindemanj2@michigan.gov, toddw1@michigan.gov

Kristie A. Sparks at: sparksdiakowk@michigan.gov,
MarshM3@michigan.gov, quintona1@michigan.gov,
toddw1@michigan.gov

John L. Thurber at: thurberj@michigan.gov, parrishs@michigan.gov,
schuellerT@michigan.gov

Ronald W. Chapman, Sr. at: rchapman@chapmanlawgroup.com,
esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Wedad Ibrahim at: wibrahim@chapmanlawgroup.com,
esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Cullen B. McKinney at: Elaine.Moore@tnmglaw.com,
Renee.Elwell@tnmglaw.com

Trevor J. Zamborsky at: Trevor.Zamborsky@tnmglaw.com

I hereby also certify that the foregoing document will be served to the

Registered Agent of newly added Defendants or newly added Defendants listed in

the above-captioned matter pursuant to Rule 4 of the Federal Rules of Civil

Procedure and an Affidavit of Service will be filed with the Court upon completion of service.

Dated: February 20, 2020                          /s/Rebekah L. Bailey

                                                  Rebekah L. Bailey (MN 0389599)

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| MACHELLE PEARSON, MARIA SHELDON, and RACHELL GARWOOD, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MICHIGAN DEPARTMENT OF CORRECTIONS, HEIDI WASHINGTON, in her individual and official capacity, JEREMY HOWARD, in his individual and official capacity, SHAWN BREWER, in his individual and official capacity, RUSSELL MARLAN, in his individual and official capacity, KENNETH MCKEE, in his individual and official capacity, LLOYD RAPELJE, in his individual and official capacity, LIA GULICK, in her individual and official capacity, MARTI KAY SHERRY, in her individual and official capacity, DAVID JOHNSON, in his individual and official capacity, KARRI OUSTERHOUT, in her individual and official capacity, WAYNE STATE UNIVERSITY, CARMEN MCINTYRE, in her individual and official capacity, JAMES BLESSMAN, in his individual and official capacity, CORIZON HEALTH, INC., a Delaware Corporation, and JEFFREY | Case No. 2:19-cv-10707 VAR-PTM<br><br>District Judge Victoria A. Roberts<br>Mag. Judge Patricia T. Morris |

| | |
|---|---|
| BOMBER, in his individual and official capacity, ) ) | |
| Defendants. | |

| | |
|---|---|
| ) REBECCA SMITH, on behalf of ) herself and others similarly situated, ) ) Plaintiff, ) ) v. ) ) MICHIGAN DEPARTMENT OF ) CORRECTIONS, HEIDI ) WASHINGTON, in her individual ) capacity, SHAWN BREWER, in his ) individual capacity, and CORIZON ) HEALTH, INC., a Delaware ) Corporation, ) ) Defendants. ) ) | Case No. 2:19-cv-10771 VAR-EAS<br><br>District Judge Victoria A. Roberts<br>Mag. Judge Elizabeth A. Strafford |

**ERNST & MARKO LAW, PLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48226
P: (313) 777-7LAW
jon@jmarkolaw.com

**NICHOLS KASTER, PLLP**
Matt H. Morgan (MN304657)
Rebekah L. Bailey (MN0387013)
Nichole Schladt (MN0400234)
80 South Eighth Street, Suite 4600
Minneapolis, MN  55402
P: (612) 256-3200
morgan@nka.com

**PITT  MCGEHEE  PALMER  &**

**MI DEP'T OF ATTORNEY GEN.**
Scott A. Mertens (P60069)
Neil Giovanatti (P82305)
Tracey Van den Bergh (P70066)
Kristie A. Sparks (P79177)
John L. Thurber (P44989)
MDOC Division
P.O. Box 30217
Lansing, MI  48909
P: (517) 335-3055
mertensS@michigan.gov

***Attorneys for Defendants MDOC,***
***Washington, Brewer, Marlan,***
***McKee, Rapelje, Gulick, Johnson,***
***Ousterhout, and Sherry***

2

**RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes
(P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
cmcgehee@pittlawpc.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold St., Ste. 2320
Detroit, MI 48226
(313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

*Attorneys for Plaintiffs Pearson,
Maria Sheldon, and Rachell
Garwood*

**LAW OFFICE OF DANIEL
RANDAZZO**
Daniel Randazzo (P39935)
2731 South Adams Rd., Ste. 100
Rochester Hills, MI 48309
(248) 853-1003
Attyrandaz@aol.com

*Attorneys for Plaintiff Smith*

**CHAPMAN LAW GROUP**
Ronald W. Chapman, Sr. (P37603)
Wedad Ibrahim (P81970)
1441 West Long Lake Rd, Suite 310
Troy, MI 48098
P: (248) 644-6326
rchapman@chapmanlawgroup.com

*Attorneys for Defendants Corizon
and Bomber*

**TANOURY NAUTS MCKINNEY
& GARBARINO**
Cullen B. McKinney (P49757)
Trevor J. Zamborsky (P77244)
38777 Six Mile Road, Ste 101
Livonia, MI 48152
P: (313) 964-4500
Cullen.mckinney@TNMGLaw.com

*Attorneys for Defendants Wayne
State, McIntyre, and Blessman*

## JURY DEMAND

Plaintiffs and the proposed Classes they represent hereby demand a trial by jury in the above-captioned matter.

Dated: February 20, 2020                    Respectfully submitted,

/s/Rebekah L. Bailey
**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
Rebekah L. Bailey (MN 0389599)
Nicole J. Schladt (MN0400234)
80 South Eighth Street, Ste. 4600
Minneapolis, MN 55402
P: (612) 256-3200
F: (612) 338-4878
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48226
P: (313) 777-7LAW
jon@jmarkolaw.com

**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067

4

P: (248) 398-9800
F: (248) 268-7996
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**LAW OFFICES OF DAVID S. STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
F: (313) 962-0766
detroitdefender@yahoo.com
samanthabaker@thedetroitdefender.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
F: (866) 571-1020
sradner@excololaw.com

**ON BEHALF OF PLAINTIFFS PEARSON, SHELDON, AND GARWOOD**

Dated: February 20, 2020          /s/Daniel Randazzo
                                  **LAW OFFICE OF DANIEL RANDAZZO**
                                  Daniel Randazzo (P39935)
                                  2731 South Adams Rd., Ste. 100
                                  Rochester Hills, MI 48309
                                  P: (248) 853-1003
                                  F: (248) 853-1004
                                  Attyrandaz@aol.com

                                  **ON BEHALF OF THE PLAINTIFF SMITH**

5

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2020 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Scott A. Mertens at: mertensS@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Neil Giovanatti at: GiovanattiN@michigan.gov, MarshM3@michigan.gov, parrishs@michigan.gov, ToddW1@michigan.gov

Tracey Van den Bergh at: Vandenberght@michigan.gov, lindemanj2@michigan.gov, toddw1@michigan.gov

Kristie A. Sparks at: sparksdiakowk@michigan.gov, MarshM3@michigan.gov, quintona1@michigan.gov, toddw1@michigan.gov

John L. Thurber at: thurberj@michigan.gov, parrishs@michigan.gov, schuellerT@michigan.gov

Ronald W. Chapman, Sr. at: rchapman@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Wedad Ibrahim at: wibrahim@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Cullen B. McKinney at: Elaine.Moore@tnmglaw.com, Renee.Elwell@tnmglaw.com

Trevor J. Zamborsky at: Trevor.Zamborsky@tnmglaw.com

I hereby also certify that the foregoing document will be served to the Registered Agent of newly added Defendants or newly added Defendants listed in the above-captioned matter pursuant to Rule 4 of the Federal Rules of Civil

Procedure and an Affidavit of Service will be filed with the Court upon completion of service.

Dated: February 20, 2020          /s/Rebekah L. Bailey

                                  Rebekah L. Bailey (MN 0389599)