# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |
|---|---|
| MACHELLE PEARSON, MARIA SHELDON, and RACHELL GARWOOD, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>HEIDI WASHINGTON, in her individual and official capacity, KENNETH MCKEE, in his individual and official capacity, JEREMY BUSH, in his individual and official capacity, LIA GULICK, in her individual and official capacity, MARTI KAY SHERRY, in her individual and official capacity, CRAIG HUTCHINSON, in his individual and official capacity, SHAWN BREWER, in his individual and official capacity, DAVID JOHNSON, in his individual and official capacity, KARRI OSTERHOUT, in her individual and official capacity, KRISTINA FISHER, in her individual capacity, CARMEN MCINTYRE, in her individual and official capacity, JAMES BLESSMAN, in his individual and official capacity, CORIZON HEALTH, INC., a Delaware Corporation, and JEFFREY BOMBER, in his individual and official capacity, ROBERT LACY, in his individual and official capacity, | Case No. 2:19-cv-10707 VAR-PTM<br><br>District Judge Victoria A. Roberts<br>Mag. Judge Patricia T. Morris |

| | |
|---|---|
| KEITH PAPENDICK, in his individual and official capacity, and RICKEY COLEMAN, in his individual and official capacity, | ) ) ) ) |
| Defendants. | ) ) ) |

| | |
|---|---|
| REBECCA SMITH, on behalf of herself and others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| HEIDI WASHINGTON, in her individual capacity, SHAWN BREWER, in his individual capacity, and CORIZON HEALTH, INC., a Delaware Corporation, | ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 2:19-cv-10771 VAR-EAS

District Judge Victoria A. Roberts
Mag. Judge Elizabeth A. Strafford

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48226
P: (313) 777-7LAW
jon@markolaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0387013)
Nicole Schladt (MN0400234)
80 South Eighth Street, Suite 4600
Minneapolis, MN 55402
P: (612) 256-3200
morgan@nka.com

**MI DEP'T OF ATTORNEY GEN.**
Scott A. Mertens (P60069)
Kristen M. Heyse (P64353)
Michael Dean (P71333)
Kristie A. Sparks (P79177)
John L. Thurber (P44989)
Zachary A. Zurek (P80116)
MDOC Division
P.O. Box 30217
Lansing, MI 48909
P: (517) 335-3055
mertensS@michigan.gov

*Attorneys for Defendants*
*Washington, McKee, Gulick, Sherry,*
*Brewer, Johnson, and Osterhout*

**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com

**LAW OFFICES OF DAVID S. STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold St., Ste. 2320
Detroit, MI 48226
(313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

***Attorneys for Plaintiffs Pearson, Sheldon, and Garwood***

**LAW OFFICE OF DANIEL RANDAZZO**
Daniel Randazzo (P39935)
2731 South Adams Rd., Ste. 100
Rochester Hills, MI 48309
(248) 853-1003
Attyrandaz@aol.com

***Attorney for Plaintiff Smith***

**CHAPMAN LAW GROUP**
Ronald W. Chapman, Sr. (P37603)
Wedad Ibrahim (P81970)
1441 West Long Lake Rd, Suite 310
Troy, MI  48098
P: (248) 644-6326
rchapman@chapmanlawgroup.com

***Attorneys for Defendants Corizon and Bomber***

**TANOURY NAUTS MCKINNEY & GARBARINO**
Cullen B. McKinney (P49757)
Trevor J. Zamborsky (P77244)
38777 Six Mile Road, Ste 101
Livonia, MI  48152
P: (313) 964-4500
Cullen.mckinney@TNMGLaw.com

***Attorneys for Defendants McIntyre and Blessman***

## AMENDED CONSOLIDATED MASTER CLASS ACTION COMPLAINT

Plaintiffs, by their undersigned counsel, hereby file their Amended Consolidated Master Class Action Complaint against the above-named Defendants amending the complaints of, and consolidating, case numbers 2:19-cv-10707 VAR-PTM and 2:19-cv-10771-VAR-EAS. On behalf of themselves and all others similarly situated, Plaintiffs hereby state as follows:

### **INTRODUCTION**

1.    Huron Valley Correctional Facility for Women ("WHV") is operating under a state of degradation, filth, and inhumanity, endangering the health and safety of incarcerated women and staff alike on a daily basis.

2.    WHV is underfunded, understaffed, poorly trained, poorly administered, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the prison walls.

3.    Incarcerated women are regularly denied access to adequate medical and mental health care, hygienic conditions, and movement.

4.    As a result, the women incarcerated in WHV were exposed to *Sarcoptes scabiei* ("scabies"), caused by the spread of parasitic mites.

5.    Scabies has taken a huge toll on these women, both physically and mentally because it caused horrendous, unbearable itching pain, which, in turn,

impacted the inflicted's mental health and led to scarring and additional infections.

6.      The women complained for years, but their pleas went largely ignored. Defendants failed to provide adequate access to medical care, a properly trained medical staff, screening programs, appropriate medications, and resources to properly examine, test, and treat the women's obvious symptoms of infestation.

7.      Even when Defendants did attempt to treat the women for scabies, they did so in a haphazard way and without following the proper protocols for quarantine and disinfection, ensuring that the infestation would remain to spread among the population.

8.      In fact, one brave dermatologist had to fight his way into the prison before the hundreds of women locked in WHV finally had access to the critical, life-saving treatment they so desperately needed.

9.      As discussed below, conditions at WHV have deteriorated to such a degree as to expose Plaintiffs and the proposed Classes to an unreasonable risk of serious harm to their health and safety, in violation of the rights guaranteed to them under the United States Constitution.

10.     The constitutional violations complained of herein are not isolated incidents impacting a few inmates and caused by a few doctors or correctional personnel. Rather, the scabies outbreak at WHV, and the related lack of medical care, has persisted for more than three years and impacted prisoners housed in at

2

least eight distinct units.

11.    Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at WHV yet have failed to timely or effectively remedy the deplorable state of affairs.

12.    This is a civil rights class action, brought under 42 U.S.C. § 1983, challenging the inhumane, dangerous, and unconstitutional conditions endured by the women locked inside WHV.

13.    Plaintiffs, on behalf of themselves and members of the proposed Classes, seek monetary damages, and injunctive and declaratory relief.

## JURISDICTION AND VENUE

14.    Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, and jurisdiction is therefore proper pursuant to 28 U.S.C. §§ 1331 and 1343.

15.    Venue is proper in this District under 28 U.S.C. § 1391. The parties reside, or at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district. Defendants are subject to this Court's personal jurisdiction.

## PARTIES

I)    **PLAINTIFFS**

16.    Plaintiff Machelle Pearson ("Pearson") is a woman residing in Dearborn Heights, Michigan. Pearson was formerly incarcerated at WHV and was paroled in August 2018. Pearson brings this Complaint on behalf of herself and the

3

proposed Classes, as described herein.

17.     Plaintiff Maria Sheldon ("Sheldon") is a woman residing in Grand Rapids, Michigan. Sheldon was housed at WHV until approximately February 21, 2019 when she was transferred. Sheldon was released from incarceration on approximately April 29, 2019. Sheldon brings this Complaint on behalf of herself and the proposed Classes, as described herein.

18.     Plaintiff Rachell Garwood ("Garwood") is a woman currently incarcerated in WHV since approximately August 2018. Garwood brings this Complaint on behalf of herself and the proposed Classes, as described herein.

19.     Plaintiff Rebecca Smith ("Smith") is a woman currently incarcerated in WHV since approximately February of 2010. Smith brings this Complaint on behalf of herself and the proposed Classes, as described herein.

## II)     MDOC DEFENDANTS

20.     Defendant Heidi Washington ("Washington"), at all relevant times, has been the Director of the Michigan Department of Corrections ("MDOC"). As Director, Washington oversees Michigan's correctional system, including WHV. Washington is named as a Defendant in both her official and individual capacity.

21.     Defendant Kenneth McKee ("McKee"), at relevant times, has been the Deputy Director for the Correctional Facilities Administration ("CFA") at MDOC. McKee is named as a Defendant in both his official and individual capacity.

4

22.     Defendant Jeremy Bush ("Bush"), at relevant times, has been the Assistant Deputy Director of the Jackson Region for CFA at MDOC.  Bush is named as a Defendant in both his official and individual capacity.

23.     Defendant Lia Gulick ("Gulick"), at relevant times, has been the Acting Deputy Director for Budget and Operations Administration ("BOA") at MDOC. Gulick previously worked as the Administrator for the Bureau of Health Care Services ("BCHS").   Gulick is named as a Defendant in both her official and individual capacity.

24.     Defendant Marti Kay Sherry ("Sherry"), at relevant times, has been the Acting Administrator for BCHS for the MDOC.  Sherry is named as a Defendant in both her official and individual capacity.

25.     Defendant Craig Hutchinson, M.D., ("Hutchinson"), has been at all relevant times the Infectious Disease Coordinator / Director for the MDOC. Hutchinson is named as a Defendant in both his official and individual capacity.

## III)   WHV DEFENDANTS

26.     Defendant Shawn Brewer ("Brewer"), at relevant times, has been the Warden of WHV, and is now the acting Assistant Deputy Director for the Operations Division of the CFA at MDOC. Brewer is named as a Defendant in both his official and individual capacity.

27.     Defendant David Johnson ("Johnson"), at relevant times, has been the

5

Deputy Warden of WHV. Johnson is named as a Defendant in both his official and individual capacity.

28.    Defendant Karri Osterhout ("Osterhout"), at relevant times, has been the Deputy Warden of WHV. Osterhout is named as a Defendant in both her official and individual capacity.

29.    Defendant Kristina Fisher ("Fisher"), at relevant times, was the Health Unit Manager at WHV. Fisher is named in both her official and individual capacity.

**IV)    WAYNE STATE DEFENDANTS**

30.    Defendant Carmen McIntyre ("McIntyre") has been since approximately January 2018 the Chief Medical Officer for the MDOC through a contract between the MDOC and Wayne State University School of Medicine ("Wayne State"). McIntyre is employed by Wayne State. McIntyre is named as a Defendant in both her official and individual capacity.

31.    Defendant James Blessman ("Blessman") has been since approximately January 2018 the Assistant Chief Medical Officer for the MDOC through a contract between the MDOC and Wayne State. Blessman is employed by Wayne State. Blessman is named as a Defendant in both his official and individual capacity.

**V)    CORIZON DEFENDANTS**

32.    Defendant Corizon Health, Inc. ("Corizon") is a corporation

incorporated in Delaware that does a substantial amount of its systematic and continuous business in Michigan as "Corizon of Michigan," and has been registered to do business in Michigan since 2000.

33.    Defendant Jeffrey Bomber, D.O., C.C.H.P. ("Bomber") was at all relevant times acting State Medical Director at Corizon. Bomber is named as a Defendant in both his official and individual capacity.

34.    Defendant Robert Lacy, D.O. ("Lacy") has been at all relevant times the acting Regional Medical Director at WHV. Lacy is named as a Defendant in both his official and individual capacity.

35.    Defendant Keith Papendick, M.D., ("Papendick"), has been at all relevant times the Outpatient Utilization Manager for Corizon. Papendick is named as a Defendant in both his official and individual capacity.

36.    Defendant Rickey Coleman, D.O., ("Coleman"), has been at all relevant times the Acting Chief Medical Officer as well as the Inpatient Utilization Manager for Corizon. Coleman is named as a Defendant in both his official and individual capacity.

## FACTUAL ALLEGATIONS

37.    Plaintiffs and the proposed Classes, by reference incorporate the preceding paragraphs as though fully set forth herein.

38.    Plaintiffs are and were inmates of WHV and bring this action on behalf

of similarly situated former, current, and future inmates of WHV.

39.     WHV houses incarcerated women in Washtenaw County, Michigan. The facility houses substantially more than 2,000 women at any given time.

40.     WHV is currently the only women's prison in the State of Michigan.

**I)      THE OUTBREAK**

   **A)      <u>Conditions at WHV</u>**

41.     At all material times, the prison and its bunkrooms have been overcrowded, and the conditions at WHV are filthy and dangerous, providing a breeding ground for communicable diseases and pests.

42.     Defendants do not provide a medical screening for scabies prior to placing inmates in the general population at the facility.

43.     Additionally, while the MDOC and WHV Defendants used to allow incarcerated women to clean with bleach, they changed that practice and began providing significantly diluted cleaning agents that do not adequately clean the aggressive filth.

44.     Defendants were aware of these conditions and did nothing to remedy the dangerous situation.

45.     Defendants systemically failed to provide livable conditions at WHV and failed to provide basic medical care and treatment to inmates, resulting in a persistent and reoccurring scabies outbreak, which spread throughout WHV's

8

multiple units and which Defendants continuously failed to eradicate.

**B)**   **Scabies**

46.    Scabies is an infestation. Tiny mites, known as *Sarcoptes scabiei*, live in the outer layers of human skin. As the mites burrow and lay eggs, the infestation leads to relentless itching and rashes. (See https://www.webmd.com/skin-problems-and-treatments/ss/slideshow-scabies-overview).

47.    The rash can appear as small red bumps, welts or scaly lesions that can transform into scales, blisters, bleeding, and open sores caused by scratching. (See https://www.verywellhealth.com/scabies-overview-1069441.)  The  scabies  rash typically occurs on the wrists, in between fingers, in armpits, around the waist, between thighs, and in the genital area. (Id.)

48.    Scabies is contagious and typically spreads through skin-to-skin contact,  but  that  is  not  the  only  means  of  transmission.  (See https://www.aad.org/public/diseases/contagious-skin-diseases/scabies#overview.) Shared personal items such as bedding, clothes, furniture or towels may also cause the spread. (Id.)

49.    It is well-known that prison inmates can be at a higher risk for acquiring scabies. (See https://www.webmd.com/skin-problems-and-treatments/ss/slideshow-scabies-overview.)

50.    Scabies infestations lead to relentless and unbearable itching, especially

at night.

51.     Due to the severity of the itching at night, those infested with scabies can      demonstrate      an      inability      to      sleep.      (see https://www.aad.org/public/diseases/contagious-skin-diseases/scabies#symptoms.)

52.     The inability to sleep and perpetual discomfort, particularly over long periods of time, can result in mental illness and/or severe emotional distress.

53.     The itching and scratching associated with scabies also may lead to painful open sores, secondary bacterial infections, and/or secondary infestations of microorganisms, including *Staphylococcus aureus* and *Streptococcus pyogenes*. (See https://www.michigan.gov/documents/scabies_manual_130866_7.pdf.)

54.     Scabies can result in permanent, visible scarring.

55.     Doctors should be able to identify scabies based on the appearance of the rash and the description of the itch. Other standard tests can also be used to diagnose   the   condition.   (See   https://www.webmd.com/skin-problems-and-treatments/ss/slideshow-scabies-overview.)

56.     Verification of a scabies infestation should be attempted prior to treatment.   (See   https://www.michigan.gov/ documents/scabies_manual_130866 _7.pdf.)

57.     When treating scabies, the environment must also be thoroughly cleaned to prevent re-infestation.  (Id.)  This includes changing and laundering all

10

patient linens and washable personal items in water that is at least 120 degrees Fahrenheit before and after treatment and sealing non-washable items in a plastic bag for seven days. (Id.) Furniture should be disinfected and covered in plastic for seven days. (Id.) Patient rotation among units should be ceased. (Id.) Symptomatic patients should be monitored weekly. (Id.) If symptom severity does not lessen after two weeks, the scabies diagnosis and/or treatment should be reconsidered. (Id.)

**C)**    **The Rash**

58.    In or around November 2016, detainees and inmates at WHV began complaining to Defendants, as well as multiple guards, nurses, nurse practitioners, and doctors, about horrible itching and rashes they were developing.

59.    The rashes appeared to begin in the Gladwin unit and spread to at least eight of WHV's fifteen units by March of 2018. Paul Egan, "Prison Will Close to Visitors While All 2,000 Women treated for Scabies," Detroit Free Press (Jan. 14, 2019).

60.    The rashes women developed caused red bumps to appear on the inner thighs, buttocks, arms, backs, and chests of those afflicted, and caused unbearable pain from itching.

61.    Women complained about the symptoms, but their requests for treatment largely were ignored by guards, nurses, physician assistants, and physicians.

11

62.     Defendants engaged in a pattern and practice of refusing to provide women with medical care, dismissing women's complaints without providing proper evaluation of symptoms, failing to properly test for and treat scabies, failing to properly disinfect cells and personal items, and failing to properly quarantine and contain impacted women.

63.     The rash and itching were so unbearably painful that many of the women will suffer scarring because of the rash itself, as well as scratching to relieve the horrendous itching.

64.     For example, Plaintiff Pearson's rash was so bad that she has scars around her ankles and feet. Another inmate developed large bruises on her thighs from all the itching.

65.     Further some women will develop additional bacterial infections from improper treatment of the wounds caused by the scratching.

66.     According to published newspaper articles, despite repeated complaints to Defendants about the rashes, in February 2018, Defendants "ruled out" scabies as the main source of the rash outbreak.  See Paul Egan, "How Flint MD solved rash mystery that stumped women's prison officials," Detroit Free Press (Jan. 18, 2019).

67.     In February and March of 2018, dermatologists evaluated and tested some affected patients, but their testing and medication recommendations were ineffective. (Id.)

12

68.     Defendant McIntyre subsequently postulated that the samples were likely gathered by inaccurate scraping methods. Egan, <u>supra</u> (Jan. 14, 2019).

69.     Notably, the Michigan Department of Community Health cautions that "[n]egative findings do not rule out the presence of scabies." (https://www.michigan.gov/documents/scabies_manual_130866_7.pdf.)

70.     Defendants administered (and directed the administration of) prescription steroid cream, claiming that it had been effective for some of the afflicted women.

71.     Defendants did not provide creams to all women exhibiting symptoms. As a result, untreated women had to beg those lucky enough to receive the creams to share.

72.     When the steroid cream did not work, Defendants advised the women to try mixing the steroid cream and other ointments together to try to remedy the rash.

73.     Unsurprisingly, this haphazard mixture did not provide any relief to the afflicted women who's suffering only worsened as the year continued.

74.     The itching and discomfort were so bad that women resorted to pouring bleach mixtures on their body in the shower.

75.     It was not until the end of 2018—nearly ten months after WHV's first tests—when Defendants again seriously considered the possibility of scabies.

13

Around that time, some women were allegedly treated for scabies, and clothing and bed linens were allegedly replaced. <u>See</u> Paul Egan, "At least 24 Cases of Scabies Found at Michigan's Only Women's Prison," <u>Detroit Free Press</u> (Jan. 4, 2019).

76.   In fact, it wasn't until Dr. Walter Barkey, a dermatologist from Flint, visited WHV in late December 2018 to meet with inmates, that a diagnosis of scabies was made.

77.   Dr. Barkey, who had read reports about the rash outbreak and received information firsthand from a friend whose daughter is an inmate at WHV, reached out to Defendants to offer to examine and treat the afflicted prisoners. <u>See</u> Egan, <u>supra</u> (Jan. 18, 2019).

78.   Dr. Barkey had several telephone interviews with Defendants to see inmates at the facility before he was allowed access. (<u>Id.</u>)

79.   Dr. Barkey brought a microscope with him to the facility and was able to detect samples of the live mites from skin scrapings of some women and determined their rashes were scabies. (<u>Id.</u>)

80.   Dr. Barkey is quoted as saying, "To my knowledge there were never any plans to 'bring in' a dermatologist." (<u>Id.</u>)

81.   By December 2018, on information and belief, nearly 200 women, almost 10% of the total prison population, suffered from an unbearable rash and red bumps that had been plaguing women since November 2016.

82.    Instead of helping the incarcerated women, in November or December of 2018, Defendants blamed the inmates as the cause of their own suffering—saying that the rash was a result of the women improperly using prison-issued cleaning fluids and using "homemade" laundry detergent to hand-wash their clothing, rather than sending them to the prison laundry.

83.    While Defendants tried testing for parasites in early 2018, they had failed to properly diagnose the incarcerated women and effectively eradicate the infestation because, on information and belief, Defendants failed to train its health officials on or properly execute Michigan's Department of Community Health, Scabies Prevention and Control Manual or other applicable scabies protocols.

84.    For example, the Scabies Prevention and Control Manual recommends that facilities assemble an outbreak team of key personnel including infection control professionals, the medical director, housekeeping, administration, nursing, employee health (if available), and other departments as needed. The Manual describes that this team should be responsible for assessing the scope of the outbreak and determining an appropriate course of action. The Manual also suggests that a member of the outbreak team should be designated to communicate outbreak information to the local health department.

85.    Upon information and belief, Defendants, and notably Defendants Washington, Brewer, and McIntyre, failed to assemble the suggested outbreak team

or follow the suggested outbreak protocols.

86.     Defendants had approximately two years before Dr. Barkey's arrival to bring in a competent dermatologist to examine the skin rash that the incarcerated women were suffering from, or successfully test, appropriately treat, and/or properly eradicate the skin rash that plagued the prison.

87.     It was not until early January 2019 when Defendants acknowledged they were aware of the scabies diagnosis and could treat it. See Egan, supra (Jan. 4, 2019).

88.     According to published reporting, Defendants only attempted to treat all 2,070 women inmates for scabies after Dr. Barkey's visit. See Egan, supra (Jan. 18, 2019).

89.     Defendants only began to quarantine infested individuals from the general population or disinfect their surroundings in 2019.

90.     Even these efforts, however, have been inadequate, often requiring some inmates to be quarantined multiple times and submit to up to seven or eight doses of the prescribed medication, likely due in part to re-infestation caused by poor disinfecting and quarantining.

91.     For example, in November 2019—seven months after the initiation of this case—women housed in the Filmore unit were placed on lockdown and were medicated with two more doses of Ivermectin due to another scabies outbreak.

16

## II)   THE PLAINTIFFS

### A)   <u>Plaintiff Pearson</u>

92.   Plaintiff Pearson was an inmate in WHV's Gladwin unit from approximately the end of December 2016 until June 2017.

93.   Shortly after her arrival, Plaintiff Pearson began experiencing significant itching related to rashes in her feet and thighs.

94.   The rashes were visible and a source of major emotional distress and physical injury.

95.   The rashes had the hallmarks of scabies: pimple-like bumps, scales, blisters, and sores.

96.   Plaintiff Pearson developed scarring on her thighs, feet, and back.

97.   Plaintiff Pearson believes she reported problems associated with her rashes to the health care unit of WHV on more than 10 occasions.

98.   Plaintiff Pearson was provided unhelpful creams and a pill intended to treat worm infestations to try to treat the rash. She was also quarantined for three days. But beyond this ineffective treatment, Plaintiff Pearson's complaints were otherwise ignored by Defendants and she received nothing to help with the itching.

99.   Despite repeated complaints, Plaintiff Pearson was not seen by a dermatologist.

100.   Plaintiff Pearson has suffered physical injuries and emotional distress

17

related to the untreated rashes.

101.   Plaintiff Pearson did not get proper help for her condition until her release. Pearson lost two toenails as a result of the healing process.

### B)   **Plaintiff Sheldon**

102.   Plaintiff Sheldon became an inmate released in general population at WHV in the Filmore unit in approximately the beginning of July 2018.

103.   Around the time she arrived, guards circulated diagrams of women's bodies and asked them to circle where on their body they were itching or experiencing other systems.

104.   Plaintiff Sheldon began itching and experiencing discomfort almost immediately, particularly at night.

105.   The rashes had the hallmarks of scabies: pimple-like bumps, scales, blisters, and sores.

106.   She found them on her buttocks, thighs, armpits, and behind her knees.

107.   The rashes were visible and a source of major emotional distress and physical injury.

108.   Plaintiff Sheldon reported problems associated with her rashes to the healthcare unit of WHV on several occasions.

109.   Plaintiff Sheldon issued her first notice to Defendants of her rash problems in or around August 2018, providing a detailed outline of the issue. She

18

received no medical attention in response. She was told she was suffering from mosquito bites.

110.   Plaintiff Sheldon begged nurses to see her, and after much persuading, she was permitted to see a doctor in approximately September or October of 2018. The doctor indicated to Sheldon that her symptoms presented as scabies and that he was going to prescribe treatment accordingly.

111.   He further subjected Plaintiff Sheldon to skin scrapings and biopsies, and subsequently informed her that she was negative for scabies. Plaintiff Sheldon later found out that WHV was scraping incorrectly, leading to the negative results.

112.   Plaintiff Sheldon never received the medication prescribed by the doctor.

113.   When Plaintiff Sheldon told Deputy Howard she had scabies, Howard disagreed and insisted that the issue was women's use of homemade detergents and inadequate toilet cleaning. Plaintiff Sheldon informed Deputy Howard that she did not use homemade detergents.

114.   Plaintiff Sheldon continued to complain, and her suffering continued to be ignored.

115.   Plaintiff Sheldon herself consulted medical resources about her condition. From her own research, she determined she likely had scabies.

116.   It was only after she was seen by an outside dermatologist on or about

December 27, 2018, that she was officially diagnosed with scabies.

117.   After this, Plaintiff received multiple doses of medication, but she was never properly quarantined, and her environment was not effectively disinfected, making eradication difficult.

118.   For example, after quarantine in December of 2018, they re-placed her in open barracks in the Lenawee unit without disinfecting her bedding or living area.

119.   During another quarantine, they took her clothes but let her keep on her dirty bra and underwear. After quarantine, Defendant gave her back her dirty, unwashed clothes to wear.

120.    Plaintiff Sheldon was transferred days before receiving her final dosage. She worried that she would place inmates at other facilities at risk.

121.   Plaintiff Sheldon has suffered physical injuries and emotional distress related to the untreated rashes. She has permanent dark spots on her body as a result.

### C)   **Plaintiff Garwood**

122.   Plaintiff Garwood became an inmate released in general population at WHV in Unit 9 in approximately August 2018. Plaintiff Garwood is presently incarcerated at WHV.

123.   In approximately September 2018, Plaintiff Garwood was moved to Filmore A, where she was housed with a bunkmate who had been suffering from a rash long before Plaintiff Garwood's arrival. Plaintiff Garwood's bunkmate had

complained about her rash to Defendants.

124.    In December of 2018, Plaintiff Garwood began experiencing a rash that resembled little bites on her buttocks, thighs, between her fingers, behind her knees, and under her armpits.

125.    At the time, Plaintiff Garwood's bunkmate was still suffering from a rash and was diagnosed with scabies on January 4, 2019.

126.    Despite Plaintiff Garwood's bunkmate's scabies diagnosis, Defendants did not quarantine either Plaintiff Garwood or her bunkmate, disinfect their bedding, clothes or living area, or test Plaintiff Garwood for scabies.

127.    Plaintiff Garwood promptly and continuously sought medical treatment for her rash, submitting at least six kite requests relating to her rash between January 4, 2019 and March 7, 2019. Despite this, healthcare canceled her only medical appointment scheduled for January 14, 2019, and never rescheduled.

128.    In or around January of 2019, Plaintiff Garwood was treated with Ivermectin, along with the rest of WHV's prison population, without first being seen by a medical treater.

129.    Between doses, Plaintiff Garwood continued to kite for medical treatment in February and March of 2019, hoping to finally be seen by a medical provider. Her rash subsided after the second dose of Ivermectin.

130.    Defendant Brewer knew about WHV's failure to provide Plaintiff

Garwood appropriate medical treatment because he signed off on Step 2 of her grievance.

131. Plaintiff Garwood suffered from a scabies rash, which caused relentless itchiness and abscesses, as well as trouble sleeping and emotional distress, for more than three months without being seen by medical personnel or tested for scabies.

132. Plaintiff Garwood has suffered physical injuries and emotional distress related to the untreated rashes.

**D)    Plaintiff Smith**

133. Plaintiff Smith became an inmate released in general population at WHV in Gladwin B in approximately February of 2010. Plaintiff Smith is presently incarcerated at WHV.

134. In January of 2017, while housed in Gladwin B, Plaintiff Smith began suffering from a visible and painful rash.

135. Plaintiff Smith promptly kited for medical treatment related to her rash, verbally complained to WHV staff, and submitted grievances, all of which went unanswered by Defendants.

136. Despite Plaintiff Smith's requests and complaints, she was not seen by medical personnel until February of 2017.

137. Despite Plaintiff Smith's visible rash and obvious distress, Defendants denied that Plaintiff Smith suffered from any illness or malady and further refused

to allow her to obtain outside medical treatment.

138.   On or about October 14, 2017, Plaintiff Smith noticed a rash of red bumps that resembled insect bites, developing on her right arm, which were accompanied by intense itching and a biting sensation.

139.   On or about January 9, 2018, Plaintiff Smith's rash worsened and spread.

140.   Plaintiff Smith reported her rash to a nurse at WHV who dismissed her complaint and merely advised that Plaintiff Smith change her soap.

141.   By February 23, 2018, Plaintiff Smith's body was covered with the rash and she, consequently, kited for medical treatment.

142.   Defendants ignored Plaintiff Smith's requests for medical treatment.

143.   Plaintiff Smith consequently grieved Defendants' failure to provide her with access to medical treatment.

144.   Plaintiff Smith's grievance, and those authored by individuals similarly situated to Plaintiff Smith, were routinely ignored and discredited by Defendants.

145.   By April 6, 2018, the itchiness of Plaintiff Smith's rash had become unbearable and she was consequently unable to sleep.

146.   Again, Plaintiff Smith kited for medical treatment and, again, it was ignored by Defendants.

147.   On or about June 18, 2018, Plaintiff Smith remained unable to sleep as

a result of the itchiness of her rash.

148.   Plaintiff Smith, again, kited for medical treatment, which was not provided.

149.   Plaintiff Smith was physically, mentally, and emotionally tormented by the sensation of insects biting her and the inability to obtain any relief from Defendants.

150.   Plaintiff Smith's emotional distress manifested itself in physical illness.

151.   Plaintiff Smith has suffered physical injury and emotional distress related to the untreated rashes. She has permanent scars on her body as a result.

### III)   THE DEFENDANTS

152.   The actions and/or omissions alleged herein occurred under color of state law, and the individual employees of the Defendants were acting within the scope and course of their employment.

153.   At material times, WHV was run by Defendants Brewer, Johnson, Osterhout, and Fisher ("WHV Defendants"). The WHV Defendants initiated and carried out the policies, practices and customs of WHV. The WHV Defendants are also liable for their own actions and/or omissions.

154.   At material times, MDOC was run in part by Defendants Washington, McKee, Bush, Gulick, Sherry, and Hutchinson ("MDOC Defendants"), all of whom initiated and carried out the policies, practices, and customs of MDOC, including

setting policies and overseeing WHV. The MDOC Defendants are also liable for their own actions and/or omissions.

155.  At material times, MDOC contracted with Defendants McIntyre and Blessman through Wayne State ("Wayne State Defendants"), providing medical training and oversight to WHV. The Wayne State Defendants are liable for their own actions and/or omissions.

156.  At material times, MDOC contracted with Defendant Corizon, which— through the direction and oversight of Defendants Bomber, Lacy, Papendick, and Coleman—provided medical services at WHV ("Corizon Defendants"). The Corizon Defendants are liable for their own actions and/or omissions.

### A) <u>The Decisionmakers at WHV</u>

#### *1.    WHV Warden Brewer*

157.  Defendant Brewer was Warden of WHV at relevant times until approximately January of 2020.

158.  The Warden at WHV is responsible for overseeing the operation of WHV; developing WHV policies and practices; and supervising, training, disciplining, and other functions for WHV's employees, staff and/or agents, including healthcare staff.

159.  The Warden is supposed to ensure that WHV enforces and abides by the law, policies, and regulations of the MDOC, the State of Michigan, and the

United States.

160.   The Warden is further responsible for the care, custody, and protection of inmates including Plaintiffs and the proposed Classes.

161.   The Warden of WHV reports directly to the Jackson Region Assistant Deputy Director of the MDOC, Defendant Bush.

162.   The Warden supervises many WHV employees, including Deputy Wardens Johnson and Osterhout and WHV Health Unit Manager Fisher.

### 2.   *WHV Deputy Wardens Johnson and Osterhout*

163.   Defendants Johnson and Osterhout have, at relevant times, served as Deputy Wardens of WHV.

164.   In this capacity, Defendants Johnson and Osterhout have upon information and belief been responsible for WHV operations, budget recommendations, policies and practices recommendations, and staff and/or agent (including healthcare staff) supervision, training, and discipline.

165.   The Deputy Wardens are responsible for ensuring WHV enforces and abides by the law, policies, and regulations of the MDOC, the State of Michigan, and the United States.

166.   The Deputy Wardens are further responsible for the care, custody, and protection of inmates including Plaintiffs and the proposed Classes.

167.   The Deputy Wardens report directly to the WHV Warden.

168. The Deputy Wardens supervise many WHV employees, and are directly involved in the hiring, training, disciplining, counseling, and grievances relating to WHV employees, including corrections officers, who maintain regular contact with inmates housed at WHV.

### 3. *WHV Health Unit Manager Fisher*

169. Defendant Fisher, WHV's Health Unit Manager ("HUM"), is responsible for operating and overseeing WHV's healthcare clinic.

170. In her capacity as a HUM, Defendant Fisher is required to meet with the Warden as often as necessary, but at least quarterly, regarding the facility's health care delivery and environment.

171. As HUM, Defendant Fisher should be aware of medical crises at WHV and would be responsible for coordinating a response to such medical crises.

172. Defendant Fisher is required to immediately report any condition that poses a danger to the health of staff or prisoners at the facility to the WHV Warden, the Assistant Chief Medical Director (at relevant times, Defendant Blessman), as well as the Director of Nursing and the Assistant Health Services Administrator.

173. Upon information and belief, the HUM reports directly to the Warden.

174. The HUM supervises many WHV employees, including, upon information and belief, all employees in WHV's healthcare clinic.

**B)**    **MDOC Control over WHV**

175.    The MDOC is the Michigan governmental agency that operates WHV.

*1.*    ***MDOC Director Washington***

176.    Defendant Washington has served as the Director of the MDOC since approximately July of 2015. She oversees Michigan's correctional system, including WHV.

177.    Her duties and responsibilities include developing and implementing policies and procedures for the operation and management of the MDOC and its employees, including prisoner healthcare.

178.    She is responsible for the care, custody, and protection of prisoners under the jurisdiction of the MDOC.

179.    Defendant Washington has full power and authority in the supervision and control of the MDOC's affairs.

180.    Defendant Washington ensures MDOC is responsible for ensuring and abiding by the laws, policies, and regulations of the State of Michigan, and the United States.

181.    Defendant Washington is directly responsible for many MDOC employees, including the BOA headed by Defendant Gulick and the CFA headed by Defendant McKee.

*2.*    ***CFA Deputy Director McKee***

182.    The Correctional Facilities Administration ("CFA") at MDOC is

responsible for the operation of all correctional institutions operated by the MDOC.

183.   As CFA Deputy Director, McKee was responsible for the operation and management of MDOC facilities, including WHV.

184.   Deputy Director McKee is a principal decisionmaker as to the management and operation of MDOC facilities, including WHV.

185.   Defendant McKee reports directly to Defendant Washington.

186.   As CFA Deputy Director, McKee also supervises the Operations Division of the MDOC, which houses the Department's Emergency Response Team Administrator/Coordinator, as well as the BHCS, which coordinates and monitors healthcare services for prisoners.

187.   Defendant McKee supervises many MDOC employees including Defendant Bush, who, in turn, supervises the WHV Warden, and Defendant Sherry.

### 3.   *Jackson Region Assistant Deputy Director Bush*

188.   Jackson Region Deputy Director Bush oversees the MDOC facilities in the Jackson, Michigan region, including WHV.

189.   As Jackson Region Deputy Director, Defendant Bush would be aware of a medical crisis in a Jackson-area facility like WHV, and he would be responsible for coordinating a response to such a medical crisis.

190.   The Warden of WHV reports to Defendant Bush.

191.   Defendant Bush reports directly to Defendant McKee.

29

4.    ***BOA Deputy Director Gulick***

192.    The BOA at MDOC provides oversight of staff support functions and oversees the MDOC's budget.

193.    As Deputy Director of the BOA, Defendant Gulick is a principal decisionmaker in determining the MDOC's budget and the allocation of funds as to prisoner healthcare and facility improvements, among other things.

194.    As the MDOC's principal administrator of the Department's budget and allocation of funds, Defendant Gulick exercises significant control over the healthcare services administered at MDOC facilities, including WHV.

195.    Defendant Gulick reports directly to Defendant Washington.

196.    Before her current role, Defendant Gulick held the position now occupied by Defendant Sherry.

5.    ***BHCS Administrator Sherry***

197.    The BHCS is responsible for the coordination and monitoring of health care services for prisoners in MDOC correctional facilities, including WHV.

198.    BHCS contracts with Defendant Corizon who provides primary care physicians, psychiatric, optometry care, pharmacy and a specialty care network for offsite services and with Wayne State who provides a Chief Medical Officer, Assistant Chief Medical Officer, and Psychiatric Officers.

199.    As    BHCS    Administrator,    Defendant    Sherry    is    a    principal

decisionmaker who oversees, coordinates, monitors, and administers prisoner healthcare.

200. Upon information and belief, Defendant Sherry directs the implementation of programs, policies, and procedures to ensure that the Department's health care system is responsive to prisoner needs throughout the MDOC and travels throughout the state to each facility to perform required site visits.

201. Defendant Sherry works with the Deputy Directors, the Director, and facilities' staff to manage facility issues and service challenges as well as set policies and procedures for the management of specialized medical populations.

202. As BHCS Administrator, Defendant Sherry has been responsible for creating training objectives, vetting training materials, and coordinating contractor training of both WHV and Corizon employees relating to integrated health care.

203. Sherry is responsible for developing special housing unit space for older/medically fragile prisoners.

204. Defendant Sherry's responsibilities include monthly meetings with the assistant health services administrator, the Directors of nursing, the Chief Medical Officer, the mental health services director, and chief psychiatric officer to discuss healthcare in the MDOC.

205. As BHCS Administrator, Defendant Sherry would be aware of a

medical crisis in a facility, such as WHV, and would be responsible for coordinating a response to such a medical crisis.

206.  Upon information and belief, no health care training is required to perform this position. Defendant Sherry works with the Bureau of Fiscal Management to ensure health care is delivered within constraints of the annual budget. The previous BHCS Administrator, Defendant Gulick, had only a background in finance and accounting.

207.  Upon information and belief, Defendant Sherry supervises many MDOC employees.

208.  Defendant Sherry reports directly to Defendant McKee.

### 6.  *Infectious Disease Coordinator Hutchinson*

209.  Defendant Hutchinson, MDOC's Infectious Disease Coordinator, is responsible for ensuring proper diagnosis, prevention, treatment, and recovery of communicable diseases in the MDOC.

210.  Pursuant to Corizon's contract with MDOC, Defendant Hutchinson must attend monthly statewide meetings with Corizon officials that address the issue of infectious disease control.

211.  As Infectious Disease Coordinator, Defendant Hutchinson would be aware of a medical crisis in a MDOC facility like WHV, and he would be responsible for coordinating a response to such a medical crisis.

32

212.   Defendant Hutchinson supervises many MDOC employees including upon information and belief the MDOC Infectious Disease Nurse, whose responsibilities include tracking outbreaks and providing assistance to prison staff.

213.   Upon information and belief, Defendant Hutchinson reports directly to Defendant Sherry and/or Defendant McIntyre.

### C)   <u>Corizon Health Services</u>

214.   Defendant Corizon, previously Prison Health Services, Inc. and Correctional Medical Services, Inc., has held a multi-million-dollar prison health contract with the State of Michigan to provide healthcare services for Michigan prisons, including WHV.

215.   Corizon has provided Michigan prisons with healthcare services, including resident physicians, since 1998.

216.   Corizon also provides MDOC with medical professionals including physicians, physician assistants, and nurse practitioners.

217.   The scope of Corizon's services expanded in 2016 to include mental health and pharmacy. Stateside Staff, "Despite Increased State Supervision, Expert Says Private Prison Health Care Comes at a Cost," <u>NPR</u> (May 25, 2018).

218.   Pursuant to Corizon's contract with MDOC, Corizon is responsible for addressing chronic medical conditions including infectious diseases in the prison facilities.

33

219.   Corizon has one state medical director for the State of Michigan, four regional medical directors, and a site director for each facility. Corizon also provides MDOC with an Infectious Disease Coordinator.

### 1.   *Corizon State Medical Director Bomber*

220.   Defendant Bomber, Corizon's state medical director, is responsible for overseeing all of Corizon's healthcare professionals in the MDOC, and he has the ultimate authority on issues concerning Corizon providing medical services in the State of Michigan.

221.   Defendant Bomber is a chief policymaker for Defendant Corizon.

222.   Defendant Bomber is a chief policymaker concerning healthcare and medical treatment of MDOC inmates, including Plaintiffs.

### 2.   *Corizon Regional Medical Director Lacy*

223.   Defendant Lacy, a Corizon regional medical director, is responsible for overseeing healthcare at WHV.

224.   Defendant Lacy trains and supervises Corizon's medical professionals in his region, including those working at WHV. Defendant Lacy has been a regional director since 2013.

225.   In his capacity as a trainer, Defendant Lacy trains Corizon medical professionals that to avoid constitutional liability for failure to provide adequate treatment to prisoners, "you still have to continue to see them and offer an opinion

34

of some kind," "no matter how often a patient complains of the same thing."

### 3.   *Corizon Outpatient Utilization Manager Papendick*

226.   Defendant Papendick, Corizon's Outpatient Utilization Manager, is responsible for processing all healthcare requests from Corizon's medical professionals and either approving or denying them.

227.   All requests in the MDOC for inmates to obtain specialty treatment beyond what a general practitioner can provide must be reviewed and approved by Defendant Papendick, including treatment by a dermatologist.

228.   Defendant Papendick reports to Defendant Bomber, who reviews and can approve Papendick's decisions.

### 4.   *Corizon Acting Chief Medical Officer Coleman*

229.   Defendant Coleman, the Acting Chief Medical Officer as well as the Inpatient Utilization Manager for Corizon, is responsible for approving or denying requests for non-formulary medications and items requested for healthcare in the MDOC.

230.   Defendant Coleman has worked for Corizon or its predecessors since 2007. Defendant Coleman works out of Colorado and does not personally see patients.

231.   Corizon's non-formulary medication approval process requires the treating medical professional to fill out and receive approval of a 407 form, which

was ultimately passed along by Defendant Corizon to Defendant Coleman for review.

232.   Non-formulary medications are those medications not routinely given to patients housed in the MDOC through a Corizon treatment plan.

### D)   Wayne State Medical Directors

233.   In or around January of 2018, MDOC through BHSC contracted with Wayne State and received two physicians to oversee healthcare for inmates in Michigan state prisons. Those physicians work with medical staff from the MDOC and Corizon to provide medical care in state prisons.

234.   Under the contract, Wayne State provides a Chief Medical Officer, an Assistant Chief Medical Officer, and a Chief Psychiatrist to MDOC to manage the prison's medical care and, upon information and belief, set and execute healthcare policy at facilities including WHV.

### 1.   *Wayne State Chief Medical Officer McIntyre*

235.   As Chief Medical Officer ("CMO"), Defendant McIntyre works closely with Defendant Corizon's medical staff to, in part, implement policies, analyze health care data, identify areas of improvement, and consult. In this position, Defendant McIntyre is responsible for monitoring the delivery of healthcare to all prisoners in the MDOC.

236.   Pursuant to MDOC Police Directive, 03.04.100(N), the CMO has the

36

authority to give standing orders, i.e., medical treatment orders, authorizing nurses to administer and/or provide treatment, labs, or medications when a patient meets a specific clinic situation. The purpose of the standing orders is to assist nurses in providing timely access to medication and treatment for specific medical needs.

237. Defendant McIntyre is the chairperson of the Medical Services Advisory Committee (MSAC). According to Defendant Papendick, while Corizon officials sit on this committee, Defendant McIntyre makes the final decisions for treatments in the MDOC.

### 2. *Wayne State Assistant Chief Medical Officer Blessman*

238. Defendant Blessman, the Assistant Chief Medical Officer for the MDOC, also works closely with Defendant Corizon's medical staff to, in part, implement policies, analyze health care data, identify areas of improvement, and consult.

## IV) DELIBERATE INDIFFERENCE

239. As described above, healthcare services at Michigan's prisons are provided by a combination of government healthcare professionals—including medical directors, nurses, and clinical monitoring teams—and third-party contractors. The use of third-party contractors to fulfil the roles of medical professionals and Chief Medical Officers permits MDOC officials to spread the responsibilities of providing healthcare to outside individuals and entities.

240.   By spreading these critical responsibilities, MDOC officials in the BHSC, comprised of nurses and non-medical professionals; the CMO, Assistant CMO, and Chief Psychiatric Officer from Wayne State; and Corizon third-party medical contractors, physicians, physician assistants, nurse practitioners, and medical treatment decision makers, can spread the blame and "hide the ball" when it comes time to determine who is actually responsible for the failure to provide adequate medical care to prisoners.

241.   For example, MDOC Policy Directives 03.04.100(Q) state that the BHCS is responsible for coordinating and monitoring all healthcare services. However, the same policy states that health services fall under the direction of the BHCS Administrator, a position that does not require any medical training, as well as the CMO and/or Chief Psychiatric Officer, who are both third-party contractors, not state employees. The next sentence then confirms it is actually the third-party medical professionals (from Corizon), under the direction of the CMO or Chief Psychiatric Officer, who are the sole decision makers regarding medical judgements for patient care.

242.   Due to deliberate indifference at all levels of the prison and healthcare system described above, the WHV, MDOC, Corizon, and Wayne State Defendants allowed scabies to torment incarcerated women for years.

243.   There was a substantial risk of harm to the Plaintiffs, Defendants knew

38

of this risk, and yet Defendants disregarded the risk at every turn.

244.    Defendants further implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference demonstrated by their colleagues holding other roles in the prison and healthcare system.

245.    Accordingly, Defendants should be held responsible for their "hide the ball" behavior and utter disregard of inmate humanity, health, and safety.

## A)    The Decisionmakers at WHV

### 1.    *WHV Deputy Warden Johnson*

246.    As Deputy Warden of WHV, Defendant Johnson was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable contagious diseases such as scabies.

247.    As Deputy Warden of WHV, Defendant Johnson was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

248.    As Deputy Warden of WHV, Defendant Johnson was aware of the conditions of the WHV facility and knew that such conditions were likely to lead to an outbreak amongst the WHV inmates of a contagious disease, such as scabies.

249.    Despite the known risk to WHV inmates posed by the conditions in the facility, Defendant Johnson failed to advocate for necessary budgetary expenditures

to improve the facility and eliminate the risk of the spread of a contagious disease, such as scabies.

250.   As Deputy Warden of WHV, Defendant Johnson was in a position to learn via observation of prisoners, inmate grievances, or from his subordinates, that a scabies outbreak was plaguing WHV as early as November of 2016.

251.   Defendant Johnson was present for at least one Warden's Forum Committee Meeting, at which inmate members of the Committee complained of the infestation.

252.   Upon information and belief, Defendant Johnson was aware of the scabies outbreak at WHV as early as November of 2016, yet he failed to act to eradicate the infestation or clean up the prison to prevent future outbreaks.

253.   Upon information and belief, Defendant Johnson was present for at least one inmate's series of skin scrapings, intended to test her rash for suspected scabies, in 2018.

254.   Upon information and belief, Defendant Johnson was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

255.   Upon learning of the scabies outbreak and further threat of contagion amongst the WHV inmate population, Defendant Johnson was required to take

40

speedy and effective measures to ensure the health and safety of WHV inmates from the scabies outbreak, by, among other things, coordinating and effectuating a plan to test, treat, and segregate inmates so as to prevent ongoing or further infection, and further report the outbreak to his superiors.

256.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant Johnson was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease by, among other things:

    a)   Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

    b)   Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

    c)   Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

    d)   Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

    e)   Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

    f)   Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

### 2.   *WHV Deputy Warden Osterhout*

257.   As Deputy Warden of WHV, Defendant Osterhout was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among

other things, preventable contagious diseases such as scabies.

258.   As Deputy Warden of WHV, Defendant Osterhout was responsible for overseeing the living conditions of WHV, ensuring that her superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

259.   As Deputy Warden of WHV, Defendant Osterhout was aware of the conditions of the WHV facility and knew that such conditions were likely to lead to an outbreak amongst the WHV inmates of a contagious disease, such as scabies.

260.   Despite the known risk to WHV inmates posed by the conditions in the facility, Defendant Osterhout failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of the spread of a contagious disease, such as scabies.

261.   As Deputy Warden of WHV, Osterhout was in a position to learn via observation of prisoners, inmate grievances, or from her subordinates, that a scabies outbreak was plaguing WHV as early as November of 2016.

262.   Defendant Osterhout was present for at least one Warden's Forum Committee Meeting, at which inmate members of the committee complained of the infestation.

263.   Upon information and belief, Deputy Warden Osterhout was aware of the scabies outbreak at WHV as early as November 2016.

264.   Defendant Osterhoust was present when a member of the proposed Classes went through 12 skin scrapings and a biopsy in 2018, along with Defendants Dr. Lacy and Dr. Blessman.

265.   Upon information and belief, Defendant Osterhout was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and further caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

266.   Upon learning of the scabies outbreak and further threat of contagion amongst the WHV inmate population, Defendant Osterhout was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the scabies outbreak, by, among other things, coordinating and effectuating a plan to test, treat, and segregate inmates so as to prevent ongoing or further infection, and further report the outbreak to her superiors.

267.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant Osterhout was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease.

268.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant Osterhout was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those

43

infected with scabies or to prevent further spread of the contagious disease by, among other things:

      a)    Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

      b)    Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

      c)    Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

      d)    Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

      e)    Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

      f)    Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

      *3.*    ***WHV Warden Brewer***

269.   As Warden of WHV, Defendant Brewer was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable contagious diseases such as scabies.

270.   As Warden of WHV, Defendant Brewer was in a position to learn via observation of prisoners, inmate grievances, or from his subordinates, that a scabies outbreak was plaguing WHV as early as November of 2016.

271.   The grievances women filed, complaining of a rash and scabies-like symptoms, brought the infestation directly to the attention of Defendant Brewer during Step Two of the inmates' grievance process, as early as November of 2016.

44

272.   Defendant Brewer was present for at least one Warden's Forum Committee Meeting, at which inmate members of the committee complained of the infestation.

273.   Defendant Brewer was present when a member of the proposed Classes went through 12 skin scrapings and a biopsy in 2018, along with Defendants Lacy and Blessman.

274.   Upon information and belief, Defendant Brewer was aware of the scabies outbreak at WHV as early as November of 2016.

275.   Upon information and belief, Defendant Brewer was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

276.   Upon learning of the scabies outbreak and further threat of contagion amongst the WHV inmate population, Defendant Brewer was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the scabies outbreak, by, among other things, coordinating and effectuating a plan to test, treat, and segregate inmates so as to prevent ongoing or further infection, and further report the outbreak to his superiors.

277.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant Brewer was deliberately indifferent to the health

and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease.

278.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant Brewer was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease by, among other things:

a)   Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

b)   Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

c)   Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

d)   Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

e)   Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

f)   Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

### 4.   *WHV HUM Fisher*

279.   As HUM at WHV, Defendant Fisher was responsible for overseeing the health and treatment of WHV inmates, including Plaintiffs, from, among other things, preventable contagious diseases such as scabies.

280.   As HUM at WHV, Defendant Fisher was in a position to learn via

observation of prisoners, inmate grievances and kite requests, or from her subordinates, that a scabies outbreak plagued WHV as early as November of 2016.

281.  Upon information and belief, HUM Fisher was aware of the scabies outbreak at WHV as early as November of 2016.

282.  In her capacity as the HUM and supervisor of the healthcare clinic at WHV, Defendant Fisher rubberstamped the denial of countless grievances despite her knowledge that Plaintiffs and members of the proposed Classes raised legitimate concerns and were suffering severely from an uncontrolled, untreated and undiagnosed rash.

283.  For over a year, inmates routinely informed Defendant Fisher of their need for treatment to cure the rash yet did not receive effective treatment nor a diagnosis.

284.  Defendant Fisher knew many women were suffering and that many women had grieved the situation. Family members even reached out to Defendant Fisher about the rash.

285.  Defendant Fisher routinely denied grievances and kite requests related to the rash.

286.  Sometimes Defendant Fisher would deny grievances and kite requests stating that the inmate's disagreement with the continued ineffective treatment did not support a claim for a denial of treatment.

47

287.   Other times she would deny the grievance or kite request stating that the inmate was seen by healthcare or that the rash was resolved when no healthcare visit had ever occurred and when the rash was still present and infecting the inmate.

288.   Finally, Defendant Fisher denied grievances and kite requests saying they were investigating the possible environmental causes of the rash.

289.   Inmates and members of the proposed Classes submitted countless kites, requests for healthcare, without any response. One inmate submitted four health care requests and received no response for several weeks. Her rash continued to get worse during this time. One of her grievances was returned as "resolved" claiming she was seen by a nurse. She still had a rash and had not been seen by healthcare as it continued to get worse.

290.   Upon information and belief, HUM Fisher was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

291.   Upon learning of the scabies outbreak and further threat of contagion amongst the WHV inmate population, HUM Fisher was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the scabies outbreak, by, among other things, coordinating and effectuating a plan to test, treat, and segregate inmates so as to prevent ongoing or further infection, and further

report the outbreak to her superiors.

292.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, HUM Fisher was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease by, among other things:

   a)   Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

   b)   Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

   c)   Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

   d)   Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

   e)   Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

   f)   Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

## B)   The Decisionmakers of MDOC

### 1.   *MDOC Director Washington*

293.   As MDOC Director, Washington was responsible for overseeing the health and safety of MDOC inmates, including those housed in WHV, from, among other things, preventable contagious diseases such as scabies, and further, for administering the MDOC's budget and the MDOC's contractual relationships,

49

including that with Corizon.

294.   Defendant Washington knew that the MDOC had not utilized its budget to invest in infrastructural improvement or to address overcrowding at WHV and, consequently, that the conditions at the facility were likely to lead to an outbreak of a contagious disease, such as scabies, amongst the inmates.

295.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Director Washington failed to administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of the spread of a contagious disease, such as scabies.

296.   Defendant Washington was likewise aware of the publicized deficiencies with Corizon's healthcare services for the MDOC, and with deliberate indifference to the health and safety of MDOC inmates, including Plaintiffs, continued to operate under the MDOC's contract with Corizon, causing Plaintiffs and WHV inmates to suffer from Corizon's deficient healthcare services, including Corizon's failure to test and treat WHV inmates upon notice of complaints of scabies-like symptoms.

297.   As MDOC Director, Washington was in a position to learn via inmate grievances or from her subordinates that a scabies outbreak was plaguing WHV as early as November of 2016.

298.   The grievances women filed, complaining of a rash and scabies-like

50

symptoms, brought the infestation directly to the attention of Defendant Washington during Step Three of the inmates' grievance process, as early as November of 2016.

299.   Upon information and belief, Director Washington was aware of the scabies outbreak at WHV as early as November of 2016.

300.   Upon information and belief, Director Washington was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

301.   Upon learning of the scabies outbreak and further threat of contagion amongst the WHV inmate population, Defendant Washington was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the scabies outbreak, by, among other things, coordinating and effectuating a plan to test, treat, and segregate inmates so as to prevent ongoing or further infection.

302.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Director Washington was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease  by, among other things:

  a) Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

  b) Failing to coordinate and administer effective treatment of

51

inmates' complained-of rashes and scabies-like symptoms;

c)    Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

d)    Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

e)    Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

f)    Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

303.   Upon information and belief, Director Washington refused to allocate resources to the testing and treatment of WHV inmates during the scabies infestation, in favor of allocating budgetary resources to MDOC programs that garner positive publicity, in deliberate indifference to serious health risk posed to WHV inmates.

### 2.    *CFA Deputy Director McKee*

304.   The MDOC's CFA Deputy Director, Defendant McKee was responsible for the operation and management of MDOC facilities, including WHV.

305.   As CFA Deputy Director, Defendant McKee was in a position to learn from his subordinates that a scabies outbreak was plaguing WHV as early as November of 2016.

306.   Upon information and belief, Defendant McKee was aware of the scabies outbreak at WHV as early as November of 2016.

52

307.   Upon information and belief, Defendant McKee was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

308.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant McKee was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease by, among other things:

     a)   Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

     b)   Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

     c)   Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

     d)   Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

     e)   Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

     f)   Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

### 3.   *Jackson Region Assistant Deputy Director Bush*

309.   MDOC's Jackson Region Assistant Deputy Director, Defendant Bush was responsible for the oversight of MDOC facilities in the Jackson, Michigan

region, including WHV.

310.   As Jackson Region Assistant Deputy Director, Defendant Bush was in a position to learn from his subordinates, including the Warden of WHV, that a scabies outbreak was plaguing WHV as early as November of 2016.

311.   Upon information and belief, Defendant Bush was aware of the scabies outbreak at WHV as early as November of 2016.

312.   Upon information and belief, Defendant Bush was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

313.   Upon learning of the scabies outbreak and further threat of contagion amongst the WHV inmate population, Defendant Bush was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the scabies outbreak, by, among other things, coordinating and effectuating a plan to test, treat, and segregate inmates so as to prevent ongoing or further infection.

314.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant Bush was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease by, among other things:

a)      Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

b)      Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

c)      Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

d)      Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

e)      Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

f)      Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

### 4.   *BOA Deputy Director Gulick*

315.   As BOA Deputy Director, Defendant Gulick was the principal decisionmaker in determining the MDOC's budget and the allocation of funds as to prisoner healthcare and facility improvements, among other things.

316.   As BOA Deputy Director, Defendant Gulick knew that the MDOC had not utilized its budget to invest in infrastructural improvement at WHV and, consequently, that the conditions at the facility were likely to lead to an outbreak of a contagious disease, such as scabies, amongst the inmates.

317.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Defendant Gulick failed to advocate for or administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of the spread of a contagious disease, such as scabies.

55

318.   Upon information and belief, Defendant Gulick was likewise aware of the publicized deficiencies with Corizon's healthcare services for the MDOC, and with deliberate indifference to the health and safety of MDOC inmates, including Plaintiffs, advocated for and approved of the MDOC's continued contractual relationship with Corizon because of budgetary considerations, causing Plaintiffs and WHV inmates to suffer from Corizon's deficient healthcare services, including Corizon's failure to test and treat WHV inmates upon notice of complaints of scabies-like symptoms.

319.   As BOA Deputy Director, Defendant Gulick was in a position to learn from her subordinates that a scabies outbreak was plaguing WHV as early as November of 2016.

320.   Upon information and belief, Defendant Gulick was aware of the scabies outbreak at WHV as early as November of 2016.

321.   Upon information and belief, Defendant Gulick was, at all relevant times, aware that a scabies outbreak at WHV posed a significant health risk to WHV inmates and caused those who contracted scabies significant, long-term discomfort and substantial emotional distress.

322.   Upon learning of the scabies outbreak and further threat of contagion amongst the WHV inmate population, Defendant Gulick was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the

scabies outbreak, by, among other things, coordinating and effectuating a plan to test, treat, and segregate inmates so as to prevent ongoing or further infection.

323.   Despite the duty owed to WHV inmates and knowledge of the scabies health crisis at WHV, Defendant Gulick was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to aid those infected with scabies or to prevent further spread of the contagious disease by, among other things:

> a)     Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

> b)     Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

> c)     Failing to coordinate and administer effective quarantine protocols for inmates with scabies-like symptoms;

> d)     Failing to coordinate and administer effective disinfection protocols for inmates with scabies-like symptoms;

> e)     Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

> f)     Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

324.   Upon information and belief, Defendant Gulick refused to allocate resources to the testing and treatment of WHV inmates during the scabies infestation, in favor of allocating budgetary resources to MDOC programs that garner positive publicity, in deliberate indifference to a serious health risk posed to

WHV inmates.

       *5.*   ***BHCS Administrator Sherry***

325.  As Acting Administrator for the MDOC's BHCS, Defendant Sherry maintained oversight and control of Michigan's contract with Corizon for the MDOC. In this role, Defendant Sherry directly signed off on protocols related to testing, medication, and other health services provided by Corizon and their subcontractors in response to the scabies outbreak.

326.  Upon information and belief, Defendant Sherry possessed intimate knowledge of the penalties and course corrective plans that Corizon faced related to their operations in Michigan's prisons. Still, upon information and belief, Defendant Sherry failed to address the scabies outbreak at WHV.

327.  Despite Defendant Sherry's responsibility to coordinate the MDOC's response to medical emergencies, Sherry was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by Corizon and other healthcare providers for years by, among other things:

       a)   Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

       b)   Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

       c)   Failing to implement policies and procedures to ensure the health system adequately responded to a known communicable disease;

58

d)     Failing to adequately supervise and monitor the healthcare service providers of both the MDOC and Corizon who continued to provide inadequate treatment to a known communicable disease;

e)     Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

f)     Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

### 6.   *Infectious Disease Coordinator Hutchinson*

328.   Upon information and belief, Defendant Hutchinson, in his capacity as the Infectious Disease Coordinator, was fully apprised of the rash outbreak at WHV including the spreadable nature and painful side effects.

329.   Notwithstanding this knowledge and job duties, Defendant Hutchinson chose not to implement adequate policies to address a known risk to the health off Plaintiffs and the proposed class.

330.   Members of the proposed Classes were told, among other things, that they were infected with scabies, a communicable disease. Some inmates were treated for scabies as early as 2017. As more women became infected, at least one Corizon physician told inmates they were not allowed to discuss the rash.

331.   Defendant Hutchinson has monthly meetings with MDOC and Corizon healthcare officials where infectious disease control is to be discussed. Upon information and belief, the rash outbreak at WHV was discussed during these meetings since at least 2018, and as early as 2017.

332.   Multiple supervisory officials and medical providers for Corizon treated patients for a rash, openly discussed the rash and how they were not supposed to talk about it with the prisoners, were present for skin scrapings and discussion on the spread of the rash and scabies in the facility. For over a year, inmates were told corrections and healthcare officials were investigating the cause of the rash.

333.   Defendant Hutchinson acted with deliberate indifference to a known risk to Plaintiffs' health and acquiesced in the denial of adequate medical treatment at least implicitly approved of grossly inadequate care for a disease known to be spreading throughout WHV.

334.   Upon information and belief, Defendant Hutchinson was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by Corizon and other healthcare providers for years by, among other things:

     a)    Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms, despite evidence of a communicable disease in the facility;

     b)    Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms, despite evidence of a communicable disease in the facility;

     c)    Failing to implement policies and procedures to ensure the health system adequately responded to signs that inmates were suffering with a known communicable disease;

     d)    Failing to adequately train and supervise staff on signs, symptoms and treatment of communicable diseases;

60

e)      Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

f)      Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

## C)   <u>Corizon Defendants</u>

335.   MDOC pays Corizon a fixed monthly fee regardless of the number of patients treated or the amount of services rendered. This arrangement provides Corizon with "an incentive to skimp in certain areas" so to increase profits.  Sarah Lehr, "Ingham Commissioners Blast Plan to Use Company With 'Abysmal' Record for Jail Medical Care," <u>Lansing State Journal</u> (Feb. 27, 2019) (quoting District 11 Commissioner Emily Stivers of Meridian Township).

336.   Corizon will receive $715.7 million dollars under its contract with the MDOC from 2016 until 2022.  <u>Id.</u>  This is the only money available to treat the prison population. The less they spend on care, the more profit Corizon earns. Thus, there is a financial incentive to deny necessary care to prisoners and Plaintiffs.

337.   Accordingly, Corizon claims to utilize a "least expensive effective treatment" model to ensure all prisoners receive cost conscious medical treatment.

338.   In its capacity as the primary healthcare provider for MDOC, Corizon has engaged in a pattern and a practice of failing to provide adequate medical care to Michigan's inmates and detainees, including those housed at WHV, in violation of their Eighth Amendment rights against Cruel and Unusual Punishment.

61

339.   Corizon's track record working for MDOC has been "abysmal," including a "deeply troubling history of litigation and human rights abuses."   Id. (quoting District 2 Commissions Ryan Seboldt of Lansing).

340.   Corizon has been sued for medical malpractice 660 times over a five-year period.   Id.

341.   Corizon racked up more than $1.6 million in penalties from MDOC between 2016 and 2018 for failing to meet the level of services specified in its contract with the state.   Corizon has also been put on course corrective plans, most of which relate to timeliness of care.   Id.

342.   Despite this "abysmal" track record, the MDOC does not adequately oversee Corizon.   A past state audit revealed that the MDOC only completed 50% of required audits of Corizon's performance. Stateside Staff, supra.

343.   This failure of oversight by MDOC, specifically by Defendant McIntyre in her capacity as the CMO for the entire department of corrections, demonstrates the "hide the ball" relationship between the MDOC and Corizon and the policy, practice, and custom by Corizon of providing only cursory treatment for serious medical needs.

344.   While Corizon is contracted to manage healthcare at MDOC, MDOC also contracts with Defendant McIntyre to fill the position of CMO.

345.   While MDOC Policy directs that the CMO will make certain decisions,

62

like surgery approvals, Defendant Papendick has also claimed to make these approvals.

346.   From at least October 2018, countless class members received responses to their grievances stating: "Healthcare is continuing to investigate the cause of said rashes. Healthcare and corrections are looking into possible environmental cause of the rash."

347.   Defendant Corizon maintained a policy, practice, and custom of deliberate indifference to a Plaintiffs and members of the classes who suffered from a rash.

348.   Defendant Corizon maintains policies, practices, and customs to defer, or fail to treat, requests for outside consultations 90 - 99% of the time, as well intentionally providing only cursory and grossly inadequate medical care for a known serious medical need and risk to the health and safety of Plaintiffs and the proposed classes.

349.   Defendant Corizon failed to adequately train its employees to diagnose and treat the rash and scabies outbreak and instead prevented them from addressing the serious medical needs of Plaintiffs and members of the proposed class.

350.   One Corizon physician, Dr. Penrose, told an inmate that she was not allowed to discuss the rashes with the inmates.

351.   Another Corizon physician, Dr. Qin, indicated to an inmate during a

63

discussion over the rashes that he was quitting his job because he was not able to properly treat inmates the way that they should be treated.

352.   Other Corizon physicians, Dr. Sudhir and Dr. Jamesen, frequently saw patients at WHV who were experiencing the rash.

353.   An outside Dermatologist brought in to evaluate the rash specifically ordered allergy testing for infected inmates. None of the inmates received this testing.

354.   Upon information and belief, the testing was denied by a combination of Defendants Sherry, Corizon, Bomber, and Papendick.

355.   Each individual Corizon Defendant had acute knowledge of the widespread and serious infectious disease spreading through WHV. Defendants had knowledge that this was going on for several years.

### 1. *Corizon State Medical Director Bomber*

356.   Through his supervisory role as the state medical director, Defendant Bomber had acute knowledge of the severity and spreading of scabies and the related rash throughout the prison for several years and chose not to implement adequate policies to address a known risk to the health off Plaintiffs and the proposed class.

357.   Defendant Bomber enacted policies, procedure, customs, and/or protocols, which demonstrated deliberate indifference to Plaintiffs' known serious medical needs through their refusal to authorize necessary medical treatment for

Plaintiffs' serious medical needs, refusing to provide proper medical treatment to Plaintiffs over a span of several months, despite knowledge that treatment was necessary. In the alternative, Defendant Bomber knew of Plaintiffs' needs for adequate diagnosis and treatment and failed to enact necessary policies and procedures to permit constitutionally adequate medical care.

358.   Defendant Bomber acted with deliberate indifference to a known risk to Plaintiffs' health and acquiesced in the denial of adequate medical treatment and at least implicitly approved of grossly inadequate care for a disease known to be spreading throughout WHV.

359.   Upon information and belief, Defendant Bomber was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by Corizon and other healthcare providers for years by, among other things:

a)     Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

b)     Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

c)     Failing to implement policies and procedures to ensure the MDOC health system adequately responded to a known serious medical need;

d)     Failing to adequately supervise and monitor Corizon medical professionals who continued to provide inadequate treatment to a known serious medical need;

e)     Knowing about the substantial risk of harm scabies posed

65

to Plaintiffs and disregarding that risk; and

f)     Implicitly    authorizing,    approving,    or    knowingly
acquiescing in the systemwide failure to test, treat, quarantine, and
disinfect to prevent and control scabies.

### 2.     *Corizon Regional Medical Director Lacy*

360.   Through his supervisory role as the regional medical director who frequently saw inmates at WHV, Defendant Lacy had acute knowledge of the severity and spreading of scabies and the related rash throughout the prison for several years and chose not to implement adequate policies to address a known risk to the health off Plaintiffs and the proposed Classes.

361.   In his capacity as the regional medical director, Defendant Lacy is responsible for training medical professionals who work at WHV. Despite knowledge that the rash was spreading and that healthcare continuing to fail to diagnose and treat the rash, Defendant Lacy failed to properly train and supervise the medical professionals at WHV. As a result, Plaintiffs and the proposed Classes were forced to endure a painful and itchy rash that would not subside.

362.   Plaintiffs and members of the proposed Classes complained about the rash for years. Instead of receiving a diagnosis and corresponding treatment, inmates were given multiple, different creams, like over the counter CeraVe – a common moisturizer, all ineffective to treating the rash. One member of the class was given at least five different ointments and creams without a diagnosis, none curing the rash.

363.   Defendant Lacy personally saw members of the proposed Classes and

66

had direct knowledge of the nature of the rash. The rash was present in the facility and impacted Plaintiffs and the proposed Classes for several years while Defendant Lacy has held a supervisory position and personally saw patients with the rash.

364.   Defendant Lacy acted with deliberate indifference to a known risk to Plaintiffs' health and acquiesced in the denial of adequate medical treatment, at least implicitly approving of grossly inadequate care for a disease known to be spreading throughout WHV.

365.   Upon information and belief, Defendant Lacy was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by Corizon and other healthcare providers for years by, among other things:

a)   Failing to coordinate and administer effective testing of inmates' complained-of rashes and scabies-like symptoms;

b)   Failing to coordinate and administer effective treatment of inmates' complained-of rashes and scabies-like symptoms;

c)   Failing to implement policies and procedures to ensure the MDOC health system adequately responded to a known serious medical need;

d)   Failing to adequately train Corizon medical professionals who continued to provide inadequate treatment to a known serious medical need;

e)   Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

f)   Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and

67

disinfect to prevent and control scabies.

### 3.    *Corizon Outpatient Utilization Manager Papendick*

366.   Defendant Papendick, Corizon's Outpatient Utilization Manager, is responsible for processing all healthcare requests from Corizon's medical professionals and either approving or denying them.

367.   The requests are called 407s, and as of 2019 Defendant Papendick reviews at least 100 requests a day. In doing his review, he does not review the medical records of the patients, but only the request completed by the prisoner's treating physician. If that request does not contain information which Papendick believes is necessary, he simply "defers" the request. The effect of a "deferral" is the same as a denial in that the request to see a specialist results in the inmate NOT seeing the requested specialist.

368.   A Corizon medical provider testified that all of her recommendations for a consultation with a specialist were based upon her experience as a physician assistant and the standard of care necessary to properly treat the patient. However, Corizon "deferred" 90% to 99% of her recommendations and she could not think of a medical basis to do so.

369.   If a treater has the time, a treater can respond to the "deferral." However, because of the large workload of treaters at the facilities, this is often difficult or impossible, and rarely happens. A treater can also appeal the decision,

but once again, this requires time which the treaters do not have given their workload.

370.    Upon information and belief, Corizon physician's requested treatment for the rash through the 407 process and these requests were frequently denied or deferred by Defendant Papendick, despite his knowledge of the rash spreading at WHV.

371.    For several years, Plaintiffs and the proposed Classes were routinely denied specialist consultations to diagnose and treat the widespread rash. Many Plaintiffs and members of the proposed Classes suffered with the rash for years.

372.    Upon information and belief, only *some* requests were approved and *some* testing and treatment were provided despite the wide spread and increasing spread of the rash.

373.    Multiple inmates and members of the proposed Classes were denied blood tests, skin swabs, and allergy testing, despite recommendations from specialists.

374.    Upon information and belief, Defendant Papendick was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by Corizon and other healthcare providers for years by, among other things:

> a)    Failing to approve all requests for outside treatment of the rash;

69

b)     Failing to approve all recommendations by outside specialists despite knowledge of failed treatments;

c)     Deferring treatment such that effective treatment for the Plaintiffs and the proposed Classes was effectively denied;

d)     Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

e)     Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

### 4.   *Corizon Acting Chief Medical Officer Coleman*

375.   Many inmates were prescribed a host of different types of medications including steroid ointments and creams to treat the rash from MDOC and Corizon medical personnel. However, on several occasions when outside doctors prescribed certain ointments, medications, and creams to treat the rash, inmates were refused access to the medication prescribed at WHV.

376.   Upon information and belief, the medications prescribed to treat the rash were non-formulary medications and were denied by Defendant Coleman.

377.   Defendant Coleman testified that he reviews medical records prior to approving or denying a non-formulary medication request.

378.   Upon information and belief, when Defendant Coleman denied the prescription requests, he was fully aware that Plaintiffs and members of the proposed Classes were suffering from a rash that would not subside.

379.   During the time period of Corizon's contract with the MDOC,

Defendants Bomber, Lacy, Papendick, and Coleman were directly responsible for the treatment of Plaintiffs, and at the very least implicitly approved, authorized, or acquiesced in the deliberate indifference to Plaintiffs' serious medical needs. Plaintiffs and members of the proposed Classes should not have been required to wait years for a diagnosis and effective treatment to an infectious disease.

380. As a result, the disease and rash spread throughout the facility infecting more members of the class. Plaintiffs and the proposed Classes were entitled to medical treatment for their serious medical needs and the failure to do so demonstrates deliberate indifference on the part of each individual Defendant as well as illustrates the unlawful policies, practices and customs of Defendant Corizon to provide grossly inadequate care and deny or defer indefinitely effective treatment for treatable serious medical needs.

381. Upon information and belief, Defendant Coleman was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by Corizon and other healthcare providers for years by, among other things:

     a)    Failing to approve non-formulary creams, ointments, and medications to treat the rash despite knowledge that those provided were not working;

     b)    Denying prescription requests despite knowledge that Plaintiffs and members of the proposed Classes were suffering from a rash that would not subside;

      c)     Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

      d)     Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

## D)   <u>Wayne State Defendants</u>

### *1.*   ***Wayne State Chief Medical Officer McIntyre***

382.   Defendant McIntyre, in her capacity as the Chief Medical Officer for all of the MDOC, is responsible for monitoring the delivery of healthcare to all prisoners in the MDOC.

383.   At all times since Defendant McIntyre has been the CMO for MDOC, inmates at WHV have suffered from the rash described in this complaint.

384.   Upon information and belief, Defendant McIntyre has been apprised of the spreading rash and inadequate treatment methods used by healthcare personnel in the MDOC.

385.   Plaintiffs and members of the proposed Classes have filed countless grievances and kites for healthcare as a result of the rash spreading across their bodies and the facility.

386.   According to Defendant Bomber's testimony on his understanding of the MDOC policy, all high-level grievances or kites should come to the attention of the CMO and himself, the State Medical Director. According to Defendant Bomber, if an inmate is correct about inadequate treatment, the CMO would certainly be

informed.

387.  Upon information and belief, Defendant McIntyre was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by healthcare providers for years by, among other things:

    a)  Failing to give standing orders authorizing nurses to administer and/or provide treatment, labs, or medications for the rashes and sabies, thereby preventing nurses from providing timely access to medication and treatment;

    b)  Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

    c)  Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

### 2.  *Wayne State Assistant Chief Medical Officer Blessman*

388.  Defendant Blessman works closely with Defendant Corizon's medical staff to, in part, implement policies, analyze health care data, identify areas of improvement, and consult.

389.  The HUM is required to report to Defendant Blessman any condition that poses a danger to the health of prisoners.

390.  Defendant Fisher, a HUM, was personally involved with the treatment of rash on members of the proposed Classes since 2018.

391.  Defendant Blessman also saw inmates at WHV for the rash and was present when a member of the proposed Classes had 12 skin scrapings and a biopsy

in 2018. The rash continued to sicken Plaintiffs and members of the proposed Classes for the next two years.

392.   Upon information and belief, Defendant Blessman failed to implement any adequate policies to assist in the diagnosis and treatment of the rash despite his knowledge of its widespread nature and severity.

393.   Upon information and belief, Defendant Blessman was deliberately indifferent to the health and safety of WHV inmates and allowed the scabies infestation to go untreated and unaddressed by healthcare providers for years by, among other things:

     a)   Failing to work closely with Defendant Corizon's medical staff to implement policies, analyze health care data, identify areas of improvement, and consult regarding the rashes and scabies;

     b)   Knowing about the substantial risk of harm scabies posed to Plaintiffs and disregarding that risk; and

     c)   Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, quarantine, and disinfect to prevent and control scabies.

**E)**   **Collective Allegations**

394.   Even after acknowledging that a pervasive health issue existed, Defendants utterly failed to provide adequate treatment and disregarded the risks associated with the above-described health issues.

395.   Defendants' failures amount to deliberate indifference towards Plaintiffs' Constitutional rights as well as deliberate indifference to the human

feelings and physical safety of Plaintiffs and the proposed Classes they seek to represent.

396.   The pain was so severe for some women that their mental health began to deteriorate, and they contemplated suicide to escape the daily onslaught of persistent, painful itching.

397.   On information and belief, Defendants failed to train medical staff to address the inmates' obvious needs to access adequate medical care and medication, to adequately screen/test for scabies, and to recognize outbreaks of contagious conditions such as scabies.

398.   On information and belief, Defendants ignored pleas for help and failed to implement and execute applicable scabies protocols, including the Michigan Department of Community Health's Scabies Prevention and Control Manual, to treat, quarantine, and properly disinfect inmates.

399.   Poor cleaning conditions and overcrowding at WHV further aggravated the infestation.

400.   Defendants' failure to properly and timely treat and eradicate scabies has had disastrous effects as the infestation continued over more than two years to spread and re-infest various units at WHV.

401.   Despite continuous complaints—including many kites and many filed grievances—over approximately two years, Defendants maintained a policy,

custom, pattern, and practice of utterly failing to remedy their gross failures and ignoring, denying, and then deflecting responsibility for the conditions at WHV causing deprivation of Plaintiffs' constitutional rights.

402. Many women never received treatment for their symptoms at all despite submitting multiple kites complaining about rashes and itching.

403. On one occasion, a guard contacted healthcare for an inmate, but the doctors refused to see her.

404. Fed up with the delays and refusals, another woman changed tactics and complained about having a yeast infection in an attempt to receive medical attention for her rash.

405. Those who were lucky enough to eventually speak to medical professionals often had to wait several months and submit multiple kites. This delay was critical to the spread of the infestation as they lived in tight quarters with bunkmates.

406. One inmate submitted nearly two kites a day during the fall of 2018 in an attempt to obtain medical care. It took approximately a month to see a doctor.

407. While awaiting care, many women were transferred to other units, other jails, or released, spreading the infestation further.

408. Many of those inmates lucky enough to be seen by a medical professional, did not have their complaints taken seriously. One woman was told

that she was making herself itch.  Another was told she simply had dry skin.

409.  Another inmate had blisters on her wrists and between her fingers. Medical personal denied seeing a rash and told her not to kite again until she had one.

410.  Many inmates suffered for years without receiving proper diagnoses.

411.  Still others yet were hardly evaluated and many more were not tested for scabies or given medication even when doctors suspected a scabies diagnosis. Others yet received the wrong medication, exasperating symptoms in some cases.

412.  The lack of proper treatment was not simply the result of poor training and improper containment, but it also reflects an affirmative decision by administrators and officers to deliberately ignore the serious scope of the problem.

413.  On information and belief, the conditions described above persist, thereby necessitating this Court's intervention to enjoin Defendants from continuing to violate Plaintiffs' and the Class Member's constitutional rights and to hold Defendants accountable to current and formerly incarcerated women who were forced to suffer unbearable pain and horrendous, inhumane, and deplorable conditions within the walls of WHV.

## CLASS ACTION ALLEGATIONS

414.  Plaintiffs and the proposed Classes, by reference, incorporate the preceding paragraphs as though fully set forth herein.

415.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure 23.

416.   Plaintiffs assert their claims against all Defendants on behalf of the current and former inmate class defined as follows:

## Current and Former Inmate Class

All current and former detainees and inmates in WHV who, while incarcerated at WHV, had a skin rash consistent with a scabies infestation and who were denied treatment, or whose delayed treatment caused the condition to worsen, since November 2016.

417.   Plaintiffs assert their claims against Defendants in their official capacities on behalf of the injunctive relief class defined as follows:

## Injunctive Relief Class

All detainees and inmates of WHV who are incarcerated at WHV. (collectively referred to as "the proposed Classes").

418.   The proposed Classes exclude Defendants' officers, directors, and employees, as well as any judicial officer who presides over this action and members of the judicial officer's immediate family.

419.   **Fed. R. Civ. P. 23(a)(1)—Numerosity / Impracticality of Joinder**: The proposed Classes are so numerous that joinder of all proposed Class Members is impracticable. On information and belief, there are hundreds of Class Members in each proposed Class, all of whom are or were subject to the conditions set forth herein and therefore face a significant risk of serious illness and injury.

420.   Class members are identifiable using records maintained in the ordinary course of business by WHV.

421.   **Fed. R. Civ. P. 23(a)(2)—Commonality**: Common questions of law and fact exist as to all proposed Class Members. Among the common questions are, including but not limited to:

a)   Whether the unhygienic and dangerous conditions at WHV, and Defendants' refusal to provide adequate medical and mental health care, subjected proposed Classes to an ongoing, substantial, and imminent risk of physical and psychological harm, illness, and death;

b)   Whether the conditions at WHV violate the Eighth Amendment's prohibition of cruel and unusual punishment;

c)   Whether Defendants' refusal to provide adequate medical and mental health care to Proposed Classes constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment;

d)   Whether the unhygienic and dangerous conditions at WHV, and Defendants' refusal to provide adequate medical and mental health care, result in constitutionally cognizable harm or present a constitutionally unacceptable risk of harm;

e)   Whether Defendants unreasonably instituted or condoned the dangerous and unhygienic conditions at WHV and refused to provide adequate medical and mental health care;

f)   Whether Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of Proposed Classes;

g)   Whether Defendants maintain a policy, custom, and/or widespread practice of violating Proposed Classes' constitutional rights through exposure to the dangerous conditions at WHV, the lack of adequate medical or mental health care, and the failure to train medical staff to address the proposed Classes' obvious needs to access adequate

medical care;

      h)     The nature, scope, and operation of Defendants' practices, policies and customs as applied to prisoners incarcerated at WHV; and

      i)     Whether Defendants failure to hire, train, and/or supervise competent WHV staff and agents resulted in violations of Proposed Classes' constitutional rights.

422.  **Fed. R. Civ. P. 23(a)(3)—Typicality**: The claims of the Plaintiffs are typical of other members of the proposed Classes, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

423.  Further, Defendants are expected to raise common defenses to these claims, so that final relief is appropriate for both Classes.

424.  **Fed. R. Civ. P. 23(a)(4)—Adequacy of Representation**: Plaintiffs will fairly and adequately represent the interests of the proposed Classes and will serve diligently as class representatives. Their interests are aligned with those of the purported Classes and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

425.  This action is maintainable as a class action because Defendants have acted or refused to act on grounds that generally apply to the proposed Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed Classes as a whole.

426.  **Fed. R. Civ. P. 23(b)**—The Current and Former Inmate Class should

80

be certified under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The illegal conduct is standardized; the Proposed Classes do not have an interest in individually controlling the prosecution of the case.

427.   Proceeding as a class action would permit the large number of injured parties to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and judicial resources. A class action is the only practical way to avoid the potentially inconsistent results that numerous individual trials are likely to generate. Numerous repetitive individual actions would also place an enormous burden on the courts, as they would be forced to take duplicative evidence and repeatedly decide the same issues concerning Defendants' conduct.

428.   The proposed Classes should also be certified under Federal Rule of Civil Procedure 23(b)(1) and/or (b)(2) because:

     a)   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for Defendants;

     b)   The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of

81

other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c) Defendant has acted or refused to act on grounds generally applicable to the proposed Classes, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

429. Alternatively, this case can be maintained as a class action with respect to particular issues under Federal Rule of Civil Procedure 23(c)(4).

## CAUSES OF ACTION

## COUNT I: VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
### *(Against All Defendants)*

430. Plaintiffs and the proposed Classes, by reference, incorporate the preceding paragraphs as though fully set forth herein.

431. Dozens of complaints and requests for medical attention were filed by Plaintiffs and members of the proposed Classes and submitted to prison officials, all of which were inadequately addressed and many of which were ignored. The officials knew there was a substantial risk of serious harm to the proposed Classes but failed to act appropriately.

432. Despite the numerous pleas for medical assistance regarding severe skin issues and injuries, Defendants did not provide basic medical care or assistance to assist Plaintiffs or the proposed Classes.

433. Despite the numerous pleas for medical assistance regarding severe skin issues and injuries, Defendants failed to appropriately train WHV personnel to

identify, test for, treat, and/or eradicate outbreaks of contagious conditions, including scabies. The incidents of infestation were prevalent, involving hundreds of inmates. The Defendants' refusal to acknowledge the scabies, when confronted with hundreds of medical requests and grievances, is evidence of a failure to train.

434. Even when Defendants did attempt to treat Plaintiffs or the proposed Classes for scabies, it did not follow appropriate protocol for the testing, treatment, and quarantine of Plaintiffs and the proposed Classes and the disinfecting of the facilities.

435. Prison officials, including the Director and Warden, the prison guards, nursing staff, and doctors, all had actual and/or constructive knowledge of a widespread scabies infestation spreading through WHV. These individuals had knowledge of Plaintiffs' and proposed Classes' asserted serious needs or were aware of the circumstances clearly indicating the existence of such needs, or subjectively perceived a risk of harm, but disregarded them by failing to take reasonable measures to abate them.

436. The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the proposed Classes they represent under the Eighth Amendment to the United States Constitution and laws in violation of 42 U.S.C. §1983, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this Complaint.

83

437.   Such actions and decisions on the part of Defendants, individually, separately, and/or jointly, were done in a knowing, willful, or in a reckless manner and in bad faith.

438.   By virtue of the special relationship of the state-imposed custodial setting, Defendants were under an affirmative obligation to spend their resources to protect Plaintiffs and the proposed Classes from harm.

439.   Defendants had exclusive control over the movement and placement of inmates in their custody. Defendants knowingly and intentionally transferred infested inmates into the crowded cells of healthy inmates, placing them in close proximity to a dangerous contagion. Plaintiffs and the proposed Classes had no ability to transfer away from infested inmates.

440.   Defendants' policies, practices, and customs violate Plaintiffs' basic human rights and dignity, and their right to be free from unconstitutional unhygienic and dangerous conditions and cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

441.   These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official and individual capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the proposed Classes.

442.   Defendants have been and are aware of the unconstitutional and

84

dangerous conditions of WHV and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the proposed Classes.

443.    Defendants have failed to prevent, caused, and continue to cause Plaintiffs and the proposed Classes tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury they are currently experiencing or are at risk of experiencing. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the proposed Classes as set forth above.

444.    Defendants' failure and refusal to treat the scabies infestation allowed it to spread to new hosts and caused the infestation to intensify and spread. Defendants' failure and refusal to train WHV personnel to respond appropriately to the scabies infestation exacerbated the problem. Defendants therefore were the primary cause of the dangers to which Plaintiffs were exposed and increased the vulnerability of Plaintiffs to these dangers.

445.    As a result of the Defendants' actions and/or omissions, Plaintiffs and the proposed Classes were deprived of their fundamental rights guaranteed by the U.S. Constitution, including the right to be free from cruel and unusual punishment and to adequate medical care for their serious medical needs while in the custody of

the state.

446.   As a result of Defendants' unlawful conduct, Plaintiffs and the Proposed Classes are entitled to all damages and relief available at law and equity.

## COUNT II: GROSS NEGLIGENCE
### (*Against the "MDOC and WHV Defendants"*)

447.   Plaintiffs and the proposed Classes, by reference, incorporate the preceding paragraphs as though fully set forth herein.

448.   Defendants Washington, McKee, Bush, Gulick, Sherry, Hutchinson, Brewer, Johnson, Osterhout, and Fisher, as the custodial caretakers of Plaintiffs and the proposed Classes during their incarceration at WHV, owed them a duty of care.

449.   The MDOC and WHV Defendants not only breached their duty to Plaintiffs and the proposed Classes, but also acted with gross negligence under the laws of the State of Michigan as to Plaintiffs' safety, protection, and health by:

> a)   Failing to provide a reasonably clean, hygienic, and healthy environment that does not foster a breeding ground for communicable diseases, such as scabies, and that further violates MDOC policy directives;

> b)   Failing to promptly and effectively clean and disinfect Plaintiffs' living environment, including clothes, towels, sheets, and blankets, upon receiving notice of a scabies diagnosis, despite the known risk, and likelihood, that such failure would cause scabies to spread amongst the WHV population;

> c)   Failing to properly and timely quarantine infected individuals and knowingly placing inmates with visible rashes in cells with other inmates despite the known risk, and likelihood, that the rash would spread to those bunkmates;

d)      Failing to promptly provide Plaintiffs and the proposed Classes with access to appropriate medical treatment upon notice of a rash and/or scabies-related symptoms, despite the known risk, and likelihood, that such failure would exacerbate Plaintiffs' symptoms and cause scabies to spread amongst the WHV population;

e)      Acting or failing to act in other ways to expose Plaintiffs to a known and extreme risk to their health and safety that may or will become known during discovery.

450.   The acts and conduct of the MDOC and WHV Defendants alleged in the above stated cause of action, when considered under the laws of the State of Michigan, constitute gross negligence and the MDOC and WHV Defendants are not entitled to the immunity of MCL 600.1407(2) because they were grossly negligent.

451.   The conduct of the MDOC and WHV Defendants was so reckless as to demonstrate a substantial lack of concern for whether injury resulted and exhibited a deliberate indifference by intentional acts and/or omissions amounting to gross negligence.

452.   It was foreseeable that the MDOC and WHV Defendants' actions and omissions, as set forth above, would result in injury to Plaintiffs.

453.   The MDOC and WHV Defendants were the factual cause of Plaintiffs' injuries.

454.   The MDOC and WHV Defendants' actions were the ones most immediate, efficient, and direct cause of Plaintiffs' injuries.

455.   As the direct and proximate result of The MDOC and WHV

87

Defendants' gross negligence, Plaintiffs and the proposed Class are entitled to all damages and relief available at law and equity.

## RELIEF REQUESTED

456.   WHEREFORE, Plaintiffs pray on behalf of themselves and the members of the proposed Classes for entry of judgment finding and awarding as follows:

A)   Certifying the proposed Classes under Rule 23;

B)   For an Order adjudging the practices and conduct of Defendants complained of herein to be in violation of the rights guaranteed to Plaintiffs under the U.S. Constitution and federal and state law;

C)   For an Order adjudging that Defendants were deliberately indifferent to the serious medical needs of the Plaintiffs and the proposed Classes;

D)   For an Order adjudging that the MDOC and WHV Defendants' conduct was grossly negligent;

E)   For an Order adjudging that Defendants were deliberately indifferent to Plaintiffs and the proposed Classes by failing to train medical staff to address Plaintiffs' and the proposed Classes' obvious need to access adequate medical care and medication;

F)      For an award to Plaintiffs against Defendants, jointly and severally, all relief available under 42 U.S.C. § 1983 and state law, to be determined at trial, with interest on such amounts;

G)      For an award to the Proposed Classes against Defendants, jointly and severally, all relief available under 42 U.S.C. § 1983 and state law, to be determined at trial, with interest on such amounts;

H)      For an award of injunctive relief to the proposed Classes against applicable Defendants in their official capacities;

I)      For an award to Plaintiffs and the proposed Classes of actual damages, including those arising from loss of past and future income and benefits, humiliation, mental anguish, loss of reputation, emotional distress and other harm, in an amount in excess of $75,000 against Defendants in their individual capacities, and against Defendant Corizon;

J)      For an award of punitive damages against Defendants in their individual capacities, and against Defendant Corizon in an amount to be determined at trial;

K)      For an award to Plaintiffs of their attorneys' fees, disbursements, and costs in this action, pursuant to 42 U.S.C. § 1988, and as otherwise available at law or in equity;

L)   For an award of prejudgment interest;

M)   For such other and further relief as the Court deems just

and equitable.

Dated: September 25, 2020          Respectfully submitted,

/s/Channing Robinson-Holmes
**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
F: (248) 268-7996
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
Rebekah L. Bailey (MN 0389599)
Nicole J. Schladt (MN0400234)
80 South Eighth Street, Ste. 4600
Minneapolis, MN 55402
P: (612) 256-3200
F: (612) 338-4878
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48226
P: (313) 777-7LAW

jon@jmarkolaw.com

**LAW OFFICES OF DAVID S. STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
F: (313) 962-0766
detroitdefender@yahoo.com
samanthabaker@thedetroitdefender.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
F: (866) 571-1020
sradner@excololaw.com

**ON BEHALF OF PLAINTIFFS PEARSON, SHELDON, AND GARWOOD**

Dated: September 25, 2020    /s/Daniel Randazzo
    **LAW OFFICE OF DANIEL RANDAZZO**
    Daniel Randazzo (P39935)
    2731 South Adams Rd., Ste. 100
    Rochester Hills, MI 48309
    P: (248) 853-1003
    F: (248) 853-1004
    Attyrandaz@aol.com

    **ON BEHALF OF THE PLAINTIFF SMITH**

91

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2020 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Scott A. Mertens at: mertensS@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Neil Giovanatti at: GiovanattiN@michigan.gov, MarshM3@michigan.gov, parrishs@michigan.gov, ToddW1@michigan.gov

Tracey Van den Bergh at: Vandenberght@michigan.gov, lindemanj2@michigan.gov, toddw1@michigan.gov

Kristie A. Sparks at: sparksdiakowk@michigan.gov, MarshM3@michigan.gov, quintona1@michigan.gov, toddw1@michigan.gov

John L. Thurber at: thurberj@michigan.gov, parrishs@michigan.gov, schuellerT@michigan.gov

Ronald W. Chapman, Sr. at: rchapman@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Wedad Ibrahim at: wibrahim@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Cullen B. McKinney at: Elaine.Moore@tnmglaw.com, Renee.Elwell@tnmglaw.com

Trevor J. Zamborsky at: Trevor.Zamborsky@tnmglaw.com

I hereby also certify that the foregoing document will be served to the Registered Agent of newly added Defendants or newly added Defendants listed in the above-captioned matter pursuant to Rule 4 of the Federal Rules of Civil

Procedure and an Affidavit of Service will be filed with the Court upon completion of service.

Dated: September 25, 2020          /s/Channing Robinson-Holmes

**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
F: (248) 268-7996
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MACHELLE PEARSON, MARIA
SHELDON, and RACHELL
GARWOOD, on behalf of themselves
and others similarly situated,

          Plaintiffs,

    v.

HEIDI WASHINGTON, in her
individual and official capacity,
KENNETH MCKEE, in his individual
and official capacity, JEREMY
BUSH, in his individual and official
capacity, LIA GULICK, in her
individual and official capacity,
MARTI KAY SHERRY, in her
individual and official capacity,
CRAIG HUTCHINSON, in his
individual and official capacity,
SHAWN BREWER, in his individual
and official capacity, DAVID
JOHNSON, in his individual and
official capacity, KARRI
OSTERHOUT, in her individual and
official capacity, KRISTINA
FISHER, in her individual capacity,
CARMEN MCINTYRE, in her
individual and official capacity,
JAMES BLESSMAN, in his
individual and official capacity,
CORIZON HEALTH, INC., a
Delaware Corporation, and JEFFREY
BOMBER, in his individual and
official capacity, ROBERT LACY, in
his individual and official capacity,

Case No. 2:19-cv-10707 VAR-PTM

District Judge Victoria A. Roberts
Mag. Judge Patricia T. Morris

| | |
|---|---|
| KEITH PAPENDICK, in his individual and official capacity, and RICKEY COLEMAN, in his individual and official capacity,<br><br>Defendants. | ) ) ) ) ) ) ) |

| | |
|---|---|
| REBECCA SMITH, on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEIDI WASHINGTON, in her individual capacity, SHAWN BREWER, in his individual capacity, and CORIZON HEALTH, INC., a Delaware Corporation,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. 2:19-cv-10771 VAR-EAS<br><br><br>District Judge Victoria A. Roberts<br>Mag. Judge Elizabeth A. Strafford |

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48226
P: (313) 777-7LAW
jon@markolaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0387013)
Nicole Schladt (MN0400234)
80 South Eighth Street, Suite 4600
Minneapolis, MN 55402
P: (612) 256-3200
morgan@nka.com

**MI DEP'T OF ATTORNEY GEN.**
Scott A. Mertens (P60069)
Kristen M. Heyse (P64353)
Michael Dean (P71333)
Kristie A. Sparks (P79177)
John L. Thurber (P44989)
Zachary A. Zurek (P80116)
MDOC Division
P.O. Box 30217
Lansing, MI 48909
P: (517) 335-3055
mertensS@michigan.gov

*Attorneys for Defendants*
*Washington, McKee, Gulick, Sherry,*
*Brewer, Johnson, and Osterhout*

2

**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
cmcgehee@pittlawpc.com

**LAW OFFICES OF DAVID S. STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold St., Ste. 2320
Detroit, MI 48226
(313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

*Attorneys for Plaintiffs Pearson, Sheldon, and Garwood*

**LAW OFFICE OF DANIEL RANDAZZO**
Daniel Randazzo (P39935)
2731 South Adams Rd., Ste. 100
Rochester Hills, MI 48309
(248) 853-1003
Attyrandaz@aol.com

*Attorney for Plaintiff Smith*

**CHAPMAN LAW GROUP**
Ronald W. Chapman, Sr. (P37603)
Wedad Ibrahim (P81970)
1441 West Long Lake Rd, Suite 310
Troy, MI 48098
P: (248) 644-6326
rchapman@chapmanlawgroup.com

*Attorneys for Defendants Corizon and Bomber*

**TANOURY NAUTS MCKINNEY & GARBARINO**
Cullen B. McKinney (P49757)
Trevor J. Zamborsky (P77244)
38777 Six Mile Road, Ste 101
Livonia, MI 48152
P: (313) 964-4500
Cullen.mckinney@TNMGLaw.com

*Attorneys for Defendants McIntyre and Blessman*

3

---

## JURY DEMAND

---

Plaintiffs and the proposed Classes they represent hereby demand a trial by jury in the above-captioned matter.


Dated: September 25, 2020        Respectfully submitted,

/s/Channing Robinson-Holmes
**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
F: (248) 268-7996
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
Rebekah L. Bailey (MN 0389599)
Nicole J. Schladt (MN0400234)
80 South Eighth Street, Ste. 4600
Minneapolis, MN 55402
P: (612) 256-3200
F: (612) 338-4878
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500

4

Detroit, MI 48226
P: (313) 777-7LAW
jon@jmarkolaw.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha M. Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
F: (313) 962-0766
detroitdefender@yahoo.com
samanthabaker@thedetroitdefender.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
F: (866) 571-1020
sradner@excololaw.com

**ON BEHALF OF PLAINTIFFS PEARSON,
SHELDON, AND GARWOOD**


Dated: September 25, 2020          /s/Daniel Randazzo
                                  **LAW OFFICE OF DANIEL RANDAZZO**
                                  Daniel Randazzo (P39935)
                                  2731 South Adams Rd., Ste. 100
                                  Rochester Hills, MI 48309
                                  P: (248) 853-1003
                                  F: (248) 853-1004
                                  Attyrandaz@aol.com

                                  **ON BEHALF OF THE PLAINTIFF SMITH**

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2020 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Scott A. Mertens at: mertensS@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Neil Giovanatti at: GiovanattiN@michigan.gov, MarshM3@michigan.gov, parrishs@michigan.gov, ToddW1@michigan.gov

Tracey Van den Bergh at: Vandenberght@michigan.gov, lindemanj2@michigan.gov, toddw1@michigan.gov

Kristie A. Sparks at: sparksdiakowk@michigan.gov, MarshM3@michigan.gov, quintona1@michigan.gov, toddw1@michigan.gov

John L. Thurber at: thurberj@michigan.gov, parrishs@michigan.gov, schuellerT@michigan.gov

Ronald W. Chapman, Sr. at: rchapman@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Wedad Ibrahim at: wibrahim@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Cullen B. McKinney at: Elaine.Moore@tnmglaw.com, Renee.Elwell@tnmglaw.com

Trevor J. Zamborsky at: Trevor.Zamborsky@tnmglaw.com

I hereby also certify that the foregoing document will be served to the Registered Agent of newly added Defendants or newly added Defendants listed in the above-captioned matter pursuant to Rule 4 of the Federal Rules of Civil

Procedure and an Affidavit of Service will be filed with the Court upon completion of service.


Dated: September 25, 2020      /s/Channing Robinson-Holmes
                                   **PITT MCGEHEE PALMER & RIVERS PC**
                                   Cary S. McGehee (P42318)
                                   Beth M. Rivers (P33614)
                                   Channing Robinson-Holmes (P81698)
                                   117 W. 4th Street, Suite 200
                                   Royal Oak, MI 48067
                                   P: (248) 398-9800
                                   F: (248) 268-7996
                                   cmcgehee@pittlawpc.com
                                   brivers@pittlawpc.com
                                   crobinson@pittlawpc.com